[No. B203595. Second Dist., Div. Three. Dec. 11, 2008.]

In re ZENAIDO AGUILAR on Habeas Corpus.

**[CERTIFIED FOR PARTIAL PUBLICATION[1]]**

---

[1] Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of part 1. of the Discussion portion of the opinion.

COUNSEL

Steve M. Defilippis, under appointment by the Court of Appeal, for Petitioner Zenaido Aguilar.

Edmond G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Heather Bushman, Jessica N. Blonien, and Lora Fox Martin, Deputy Attorneys General, for Respondent State of California.

OPINION

KITCHING, J.—

## INTRODUCTION

In 1991, petitioner Zenaido Aguilar (Aguilar) was convicted of second degree murder. The victim was his former wife Roberta Aguilar. In 2005, the Board of Parole Hearings (Board) found that Aguilar was suitable for parole. Governor Arnold Schwarzenegger, however, reversed the Board's decision.

Aguilar asserts two primary arguments. The first is that he was not properly or timely served with the Governor's letter reversing the Board's decision. The second is that he is suitable for parole because there is no evidence that he currently poses a danger to the public if he is released. We reject the first argument in the unpublished portion of this opinion but agree with the second argument in the published portion. Accordingly, we grant Aguilar's petition for a writ of habeas corpus and order that Aguilar be released forthwith.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Preconviction Personal History*

Aguilar was born in 1931 in San Francisco. He was one of eight children. Aguilar claims that he had a normal childhood and that he got along well

with his siblings and parents. Aguilar dropped out of school in the eighth grade. He worked as a wood finisher and was a member of a union for 37 years.

### 2. Previous Record of Crime

Aguilar was convicted of two crimes as a juvenile. In 1949, he was convicted of battery and was sentenced to six months in the county jail. He was also convicted of burglary and was committed to the California Youth Authority in Lancaster.

In 1954, Aguilar was discharged from the United States Army for possession of marijuana. He subsequently served two years in North Carolina state prison for the offense. Aguilar was also convicted of driving under the influence of alcohol (DUI) in 1957 and 1972.

### 3. Aguilar's Relationship with the Victim

We described Aguilar's relationship with Roberta Aguilar in our 1994 unpublished opinion (*People v. Aguilar* (Mar. 29, 1994, B058707)) confirming Aguilar's conviction as follows: "Aguilar ('Zeke') and Roberta had a long and turbulent relationship, going back to the 1970s. They were married in 1977,[2] but the marriage was annulled in 1983. At the time of the annulment, Zeke claimed the house trailer in which the couple had lived as his separate property, and Roberta took up residence in an apartment. Zeke also obtained a temporary restraining order, ordering Roberta and her son to stay away from Zeke, because the two had attacked Zeke in his sleep on a number of occasions. Still, after the marriage was formally ended, Zeke and Roberta had an on-again, off-again relationship, during which she frequently stayed with him in his trailer.

"Roberta held Zeke responsible for the death, in 1987, of her son, and she told friends that she was going to 'get' Zeke and see him burn in Hell. Zeke had gotten the son a job, and the son had used his earnings to buy a motorcycle. He was killed while riding the motorcycle.

"Zeke twice had Roberta committed for psychiatric treatment—once at Central City Hospital and once at Dominguez Hills Hospital. While at Central City, Roberta threatened to burn Zeke's trailer."

### 4. Commitment Offense

In the early morning of February 16, 1989, the trailer in which Aguilar resided and Roberta was sleeping was destroyed by a fire. Roberta suffered

---

[2] This was Aguilar's second marriage. His first marriage ended in divorce. He had three children with his first wife but no children with Roberta.

second and third degree burns over 90 percent of her body. She died two months later after suffering through numerous skin grafts, seven major surgeries and amputation of her right forearm.

Roberta told paramedics, her treating physician and others that Aguilar had started the fire. A witness stated that he "imagined" or "thought" that he saw Aguilar approach the trailer at 4:00 a.m., shortly before he heard Roberta's horrifying screams. An arson investigator testified that the fire had been deliberately set. A paramedic and the treating physician each testified that Roberta appeared to have been splashed with flammable liquid.

Aguilar denied any involvement in the crime. He claimed that the night before the fire he had several arguments with Roberta. About 10:00 p.m., he allegedly left the trailer after Roberta, who appeared intoxicated, reached toward an area where Aguilar knew she kept a gun. Aguilar claims that he at first went to a friend's home. However, his friend was not at home, so Aguilar went to a bar, stayed there for a while, and then allegedly spent the night in his car.

The prosecution charged Aguilar with murder (Pen. Code, § 187, subd. (a))[3] and arson (§ 451, subd. (b)). The trial court, acting as trier of fact, had reasonable doubt whether Aguilar intentionally started the fire, and thus acquitted Aguilar of arson. The trial court found that Aguilar started the fire with reckless disregard for human life and thus found him guilty of second degree murder, and sentenced him to a 15-year-to-life prison term. Aguilar appealed the conviction to this court. We affirmed the judgment against Aguilar in an unpublished opinion dated March 29, 1994.[4]

### 5. *Aguilar's Behavior in Prison*

Aguilar was arrested in February 1989 and received by the Correctional Training Facility in Soledad in June 1991. He committed no violent offenses while in prison. In 2004, however, Aguilar was disciplined twice for nonviolent violations of the prison rules. On June 15, 2004, Aguilar was cited for "Disrespect Without Potential for Violence/Disruption" and was found guilty. On July 18, 2004, Aguilar was cited with "Disobeying a Direct Order" and was found guilty.

Aguilar took education courses and participated in self-help programs while in prison. He also participated in Alcoholics Anonymous and Narcotics Anonymous.

---

[3] Unless stated otherwise, all subsequent section references are to the Penal Code.

[4] We ordered that the abstract of judgment be modified to reflect the correct amount of presentence credits.

### 6. *Aguilar's Health*

Aguilar has numerous health problems. He is blind in one eye and has "foggy" vision in the other. He is a diabetic and he has had three heart attacks and one stroke. He has back, leg and knee problems, and walks with a cane.

Aguilar's mental health, however, is good. According to a prison psychologist, Aguilar has no history of psychiatric problems, displays no antisocial thinking or values, has retained his cognitive abilities, and does not suffer from any kind of mental or personality disorder.

### 7. *Postrelease Plans*

Aguilar's daughter and sister have each invited Aguilar to stay in their respective homes should he be granted parole and released from prison.[5] Due to his age and health, Aguilar does not plan on working if he is released. However, Aguilar should not have trouble supporting himself because he is entitled to receive a pension and Social Security payments.

### 8. *Parole Proceedings*

On December 6, 2005, a panel of the Board held a hearing on whether to grant Aguilar parole. Aguilar had been denied parole by the Board on at least three previous occasions. At the hearing, Aguilar testified about a number of issues but did not testify about the commitment offense. A deputy district attorney argued against granting Aguilar parole until Aguilar accepted responsibility for his crime.

On the date of the hearing, the panel found that Aguilar was suitable for parole, and that Aguilar was eligible to be released from prison after review of the Board's decision by the Governor. The full Board did not reverse or modify the panel's decision within 120 days. The panel's decision thus became the decision of the Board by operation of law on April 5, 2006. (See § 3041, subd. (b).) The Governor, however, reversed the Board's decision with a written statement dated April 17, 2006, finding that Aguilar would pose "an unreasonable risk of danger to society" if paroled.

### 9. *Habeas Corpus Proceedings*

In October 2005, Aguilar filed a petition for a writ of habeas corpus in Los Angeles County Superior Court. The superior court denied Aguilar's petition,

---

[5] Aguilar's sister Mary Jaramillo submitted a letter to the Board in support of granting Aguilar parole.

as well as his motion for reconsideration. In November 2007, Aguilar filed a petition for a writ of habeas corpus in this court.

## ISSUE

The issue in the published portion of this case is whether some evidence supports the Governor's determination that Aguilar poses a current threat to public safety.

## DISCUSSION

1. *The Governor's Reversal Statement Is Not Void Due to Improper or Untimely Service**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

2. *No Evidence Supports the Governor's Finding That Aguilar Poses a Current Threat to Public Safety*

A. *Applicable Legal Principles*

■ "Pursuant to statute, the Board 'shall normally set a parole release date' one year prior to the inmate's minimum eligible parole release date, and shall set the date 'in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public . . . .' (Pen. Code, § 3041, subd. (a).)" (*In re Roderick* (2007) 154 Cal.App.4th 242, 262 [65 Cal.Rptr.3d 16].) Release on parole is thus "the rule, rather than the exception." (*In re Smith* (2003) 114 Cal.App.4th 343, 351 [7 Cal.Rptr.3d 655].) A parole release date must be set unless the Board determines that public safety requires a lengthier period of incarceration. (*In re Lawrence* (2008) 44 Cal.4th 1181, 1202 [82 Cal.Rptr.3d 169, 190 P.3d 535]; § 3041, subd. (b).) Every inmate has a constitutionally protected liberty interest in parole decisions ordered by the Board and reviewed by the Governor. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 661 [128 Cal.Rptr.2d 104, 59 P.3d 174].)

■ In determining suitability for parole, the Board must consider certain factors specified by regulation. Circumstances tending to establish unsuitability for parole are that the inmate (1) committed the offense in an especially heinous, atrocious, or cruel manner; (2) has a previous record of violence; (3) has an unstable social history; (4) has sexually assaulted another individual in a sadistic manner; (5) has a lengthy history of severe mental

---

*See footnote, *ante*, page 1479.

problems related to the offense; and (6) has engaged in serious misconduct while in prison. (Cal. Code Regs., tit. 15, § 2402, subd. (c); *In re Lawrence, supra*, 44 Cal.4th at p. 1202, fn. 7.)

Circumstances tending to show suitability for parole include that the inmate (1) does not possess a record of violent crime committed while a juvenile; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his or her life, especially if the stress had built over a long period of time; (5) committed the crime as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) has engaged in institutional activities that suggest an enhanced ability to function within the law upon release. (Cal. Code Regs., tit. 15, § 2402, subd. (d); *In re Rosenkrantz, supra*, 29 Cal.4th at p. 654.)

The foregoing factors are general guidelines, and the Board must consider all relevant information.[6] (Cal. Code Regs., tit. 15, § 2402, subd. (b); see *In re Rosenkrantz, supra*, 29 Cal.4th at p. 655.) The fundamental consideration is public safety. (*In re Lawrence, supra*, 44 Cal.4th at p. 1205.)

■ The Governor's power to review a decision of the Board is set forth in article V, section 8, subdivision (b) of the California Constitution.[7] "Article V, section 8(b), requires that a parole decision by the Governor pursuant to that provision be based upon the same factors the Board is required to consider." (*In re Rosenkrantz, supra*, 29 Cal.4th at p. 676.)

---

[6] "Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (Cal. Code Regs., tit. 15, § 2402, subd. (b).)

[7] "No decision of the parole authority of this state with respect to the granting, denial, revocation, or suspension of parole of a person sentenced to an indeterminate term upon conviction of murder shall become effective for a period of 30 days, during which the Governor may review the decision subject to procedures provided by statute. The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider. . . ." (Cal. Const., art. V, § 8, subd. (b).)

### B. *Standard of Review*

■ We must affirm a Governor's decision that an inmate is unsuitable for parole if "some evidence" supports the conclusion that the inmate is *currently* dangerous.[8] (*In re Lawrence, supra*, 44 Cal.4th at p. 1191.) "Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the Governor. . . . [T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor, but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious." (*In re Rosenkrantz, supra*, 29 Cal.4th at p. 677.)

### C. *Application of Law to This Case*

Overwhelming evidence supports the Board's conclusion that Aguilar is suitable for parole and does not pose a current danger to society. Aguilar is a physically disabled, visually impaired, elderly man with no current or past serious mental illness. Apart from the commitment offense, there is no evidence that Aguilar has committed a violent act in or out of prison for a period of more than 50 years. Further, Aguilar has realistic parole plans to stay with a family member, and to support himself financially with his pension and Social Security payments. In light of his parole plans, behavior in prison, mental stability, preincarceration history, health, and age, Aguilar does not pose a risk to public safety greater than the average citizen.

■ The primary ground upon which the Governor denied Aguilar parole was the nature of the commitment offense itself. "[A]lthough the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." (*In re Lawrence, supra*, 44 Cal.4th at p. 1214.)

In *In re Lawrence*, the inmate had been convicted of murdering her lover's wife. Our Supreme Court found that there was some evidence supporting the

---

[8] A petition for habeas corpus in this court is an original proceeding. (*Durdines v. Superior Court* (1999) 76 Cal.App.4th 247, 250–251, fn. 5 [90 Cal.Rptr.2d 217].)

Governor's conclusion that the commitment offense was carried out in an " 'especially heinous, atrocious or cruel manner.' " (*In re Lawrence, supra*, 44 Cal.4th at p. 1224.) However, the court noted that "few murders do not involve attendant facts that support such a conclusion." (*Id.* at p. 1225.) The court further found that the inmate "committed this crime while she was experiencing an unusual amount of stress arising from circumstances not likely to recur, and that for this reason (as well as her prior crime-free life, her age, and her record of rehabilitation) there was a low risk she would commit another violent act if released." (*Id.* at p. 1226.) Accordingly, the court found that there was no evidence supporting the Governor's finding that the inmate posed a current danger to society, despite the egregious nature of the inmate's commitment offense. (*Id.* at p. 1227.)

On the same day it decided *In re Lawrence*, the Supreme Court held that there was some evidence that another inmate posed a current danger to public safety. (*In re Shaputis* (2008) 44 Cal.4th 1241 [82 Cal.Rptr.3d 213, 190 P.3d 573].) That inmate had a long history of abusive, violent, sadistic behavior toward his wives and daughters, especially after consuming alcohol. The inmate murdered his second wife after a night of heavy drinking. (*Id.* at pp. 1246–1247.) He never developed an understanding of his alcoholism and had difficulty discussing his daughters' allegations of rape, incest and domestic violence. (*Id.* at pp. 1249, 1251.) A psychological report indicated that the inmate had a " 'schizoid quality to interpersonal relationships,' " and that if he relapsed into drinking alcohol, he would present an " 'unpredictable risk' " of future domestic violence.[9] (44 Cal.4th at pp. 1251–1252.)

■ Like *In re Lawrence* but unlike *In re Shaputis*, the nature of the commitment offense here does not indicate that Aguilar is *currently* dangerous. Aguilar's commitment offense was not the culmination of ongoing criminal activity, domestic violence, substance abuse or mental illness. Although Aguilar had a turbulent and often acrimonious relationship with the victim, this relationship was apparently unique in Aguilar's life. The record contains no evidence that he had a similar relationship with any other individual, or that he engaged in a pattern of abusive, violent or sadistic behavior towards women, family members, or other people. The circumstances of Aguilar's crime thus are not likely to recur. For this reason (as well as Aguilar's pre- and postincarceration history, realistic parole plans, health, mental stability, and age) there is a low risk that Aguilar will commit another violent act if released.

---

[9] While incarcerated, the inmate married his third wife, a recovering alcoholic. (*In re Shaputis, supra*, 44 Cal.4th at p. 1247, fn. 3.) The inmate maintained no contact with his siblings, daughters or first wife. (*Id.* at p. 1249.)

The Governor relied on a correctional counselor's January 2001 report, which stated: "Considering the commitment offense, prior record, and positive prison adjustment, this writer believes that the prisoner would probably pose a low degree of threat consistent with the average person at this time, if released from prison. This assessment is based on whether he is truly innocent of the crime. While making no judgment, his general nature seems to be one of a composed, courteous and friendly make-up. His record contains no violence and much of it occurred while a juvenile. If, however, he is truly guilty, the picture severely changes and I believe he would pose a high degree of threat to the public due to the callous nature in which the crime was committed."

This report does not constitute evidence that supports denying Aguilar parole. The nature of Aguilar's commitment offense was the *sole* basis for the counselor's opinion that if Aguilar were "truly guilty," he would constitute a threat to public safety if he is released. As discussed above, the commitment offense does not, by itself, constitute sufficient evidence to deny Aguilar parole.

■ Furthermore, at least two subsequent positive psychological evaluations superseded the January 2001 report. Most recently, prison psychologist M. Macomber, Ph.D., opined in a September 3, 2005, mental health evaluation: "I agree with the prior psychologist, who indicated that his [Aguilar's] drug abuse problem is resolved. I also agree with his assessment that inmate Aguilar does not pose any more potential for violence than the average citizen in the community. In fact, in view of his advanced age and his deteriorating health, his violence potential is even lower than the average citizen in the community." Where, as here, a stale negative psychological evaluation is superseded by subsequent positive evaluations, the previous negative evaluation does not constitute evidence that the inmate poses a current danger to the public. (See *In re Lawrence, supra,* 44 Cal.4th at pp. 1223–1224.)

The Governor cited Aguilar's previous juvenile and adult convictions as evidence of his current dangerousness. However, Aguilar's juvenile convictions for battery and burglary in the late 1940's and his 1954 conviction for possession of marijuana are more than 50 years old. The record contains no evidence that in the last half-century he committed those crimes again. Aguilar's juvenile and 1954 convictions therefore do not constitute evidence of current dangerousness. Likewise, Aguilar's 1957 and 1972 DUI convictions do not support a decision denying him parole. Aguilar has participated in Alcoholics Anonymous and has not abused alcohol for many years. Dr. Macomber opined: "Due to his years of being clean and sober, alcohol abuse is no longer a current diagnostic problem."

The Governor also relied upon two nonviolent violations of prison rules. If a prisoner engages in "serious misconduct in prison" (Cal. Code Regs., tit. 15, § 2402, subd. (c)(6)), it is a factor tending to establish that the prisoner is not suitable for parole. The alleged misconduct here, however, was not sufficiently serious to justify denying Aguilar parole. Dr. Macomber stated the following: "In considering his potential for violence within the institutional environment, inmate Aguilar has never had any serious disciplinaries. He has never been accused of possession of a serious weapon, participation in riots, assaults on others, etc. His disciplinary pattern is not serious. It is noted that on 6/15/04, due to an argument with his cellie over the cellie stealing the inmate's property, the cellie ran and made a complaint against inmate Aguilar. There is no indication in this inmate's record that he poses a threat to others. His potential for violence in the institution is definitely below average."

Finally, the Governor cites the opposition of the district attorney's office to granting Aguilar parole as a ground for reversing the Board's decision. The district attorney argued that Aguilar must accept responsibility for his crime before he can be granted parole. The district attorney's argument, however, is unpersuasive. Section 5011, subdivision (b), provides: "The Board of Prison Terms[10] shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed." Indeed, the Governor's letter to Aguilar conceded that Aguilar "need not admit his guilt or change his story to be found suitable for parole by the Board."

## DISPOSITION

Aguilar's petition for a writ of habeas corpus is granted. The Governor's decision to reverse the Board's grant of parole to Aguilar is vacated and the Board's parole release order is reinstated.

Because we have reviewed the materials that were before the Board and found no evidence to support a decision other than the one reached by the Board, a remand to the Governor would amount to an idle act. (See *In re Smith* (2003) 109 Cal.App.4th 489, 507 [134 Cal.Rptr.2d 781].) We therefore order that Aguilar be released forthwith pursuant to the conditions set forth in the Board's December 6, 2005, decision. (See *In re Gray* (2007) 151 Cal.App.4th 379, 411 [59 Cal.Rptr.3d 724].)

---

[10] As of July 1, 2005, any reference to the "Board of Prison Terms" in the Penal Code refers to the Board of Parole Hearings. (§ 5075, subd. (a).)

Considering that Aguilar's release by the Board would have been final in April 2006, more than two and one-half years ago, and in the interests of justice, this opinion shall be final as to this court immediately. (Cal. Rules of Court, rule 8.264(b)(3); *In re Gray, supra*, 151 Cal.App.4th at p. 411.)

Klein, P. J., and Aldrich, J., concurred.