[No. H030031. Sixth Dist. Jan. 23, 2009.]

In re JOHN ERNEST DANNENBERG on Habeas Corpus.

**COUNSEL**

John Ernest Dannenberg, in pro. per., for Petitioner.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Jennifer A. Neill, Pamela B. Hooley and Jessica Nicole Blonien, Deputy Attorneys General, for Respondent State of California.

**OPINION**

**MIHARA, J.**—Petitioner John Ernest Dannenberg has been incarcerated since 1986 for the second degree murder of his wife. Although he has had

numerous parole hearings, he has repeatedly been found unsuitable for parole due to the gravity of the commitment offense. In 2005, the Board of Parole Hearings (the Board) decided that Dannenberg was suitable for parole and granted him parole, but the Governor reversed the Board's decision. While the Governor conceded that every factor other than the gravity of the commitment offense favored a finding that Dannenberg is suitable for parole, he concluded that the gravity of the commitment offense alone justified an unsuitability finding.

Dannenberg challenges the Governor's decision, and we conclude that it is not supported by some evidence. No evidence in the record that was before the Board and the Governor supports a conclusion that, due to the nature of his commitment offense, Dannenberg *currently* poses an unreasonable risk of danger to society if released. As there is no other evidence that Dannenberg currently poses an unreasonable risk of danger to society if released, we vacate the Governor's decision and reinstate the Board's decision.

## I.  Factual Background

The facts of the commitment offense were set forth in the California Supreme Court's 2005 opinion addressing Dannenberg's challenge to the Board's 1999 parole denial. "Dannenberg and his wife experienced severe domestic difficulties for a number of years. They had sought marriage counseling, and the victim had been seen by psychiatric personnel for complaints including violence to her and her children.

"On May 15, 1985, around 9:00 a.m., law enforcement authorities were summoned to the couple's home in Los Altos Hills. In a bathroom, they found the victim's body, draped over the side of the bathtub with her head underwater in the tub. Dannenberg had several scratches on his body, a deep bite mark on his left middle finger, and cuts on his neck, eyelid, and face. An autopsy disclosed that the victim's body had various cuts, abrasions, and puncture wounds, consistent with being hit on numerous occasions. One of the wounds matched the markings of a half-pound pipe wrench. The autopsy report concluded that although the victim had been hit many times on the head, the cause of death was drowning.

"Dannenberg gave investigating officers the following account: Around 7:00 a.m., he was drawing a bath for his son when he noticed debris in the drain that could cause a clog. He procured a pipe wrench and a screwdriver to fix a leaky toilet valve. 'During this time[,] he evidently said something to his wife' about the drain. She came into the bathroom and picked up the screwdriver. A heated argument ensued. Screaming that she 'wanted him dead,' the victim jabbed the screwdriver at Dannenberg, cutting his arm, and

clawed and scratched his forearm with her fingernails. Dannenberg first tried to defend himself with his bare hands. Then he picked up the pipe wrench and hit the victim once on the side of the head. When she continued to advance on him, he 'hit her a couple more times on the head,' and she fell to the floor. Dannenberg himself collapsed 'and may have passed out.' " (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1072–1073 [23 Cal.Rptr.3d 417, 104 P.3d 783] (*Dannenberg*).)

"After that, he remembered nothing until he saw the victim lying on the edge of the tub. A pool of blood covered the floor where she had previously lain. There was also considerable blood on her head and smeared on the wall. Dannenberg could not move at first, because his legs, curled underneath him, were asleep. From his low position, and in a dazed condition, he did not notice the victim's head was in the water. Eventually he reached over and tried to take her pulse, but could not feel anything. He then struggled to his feet, went to his bedroom, and called 911. The fire department responded within a few minutes but determined that the victim was dead and did not try to resuscitate her." (*Dannenberg, supra,* 34 Cal.4th at p. 1073.) "Exactly how [his wife drowned] is unclear. However, despite Dannenberg's insistent denials, the circumstances permit an inference that, while she was helpless from the beating, Dannenberg placed or forced her head under water, or at least allowed it to remain there, until she died." (*Dannenberg,* at p. 1069.)

## II. Judicial Proceedings

Dannenberg was convicted by a jury of second degree murder, and committed to state prison for a term of 15 years to life. He has been incarcerated since October 1986. His minimum parole eligibility date was June 25, 1996. (*Dannenberg, supra,* 34 Cal.4th at p. 1072.)

Dannenberg was found unsuitable for parole at parole hearings in 1994 and 1997. (*Dannenberg, supra,* 34 Cal.4th at p. 1072.) In 1999, the Board again found Dannenberg unsuitable for parole. It based its unsuitability finding on the gravity of the commitment offense, and Dannenberg's need for more " 'therapy in order to face, discuss, understand, and cope with stress in a nondestructive manner.' " (*Dannenberg,* at pp. 1074–1075.) Dannenberg filed a habeas corpus petition in the Marin County Superior Court challenging the Board's 1999 decision, and his habeas corpus petition was granted. The Marin County Superior Court found that there was "no evidence that Dannenberg's crime was callous and cruel, or indifferent to human suffering, beyond any and all second degree murders." (*Dannenberg,* at p. 1076.) The court ordered the Board to hold a new parole hearing at which it would be expected to set a parole date unless there was additional evidence presented or a change of circumstances. (*Ibid.*) The Board appealed. While the Board's

appeal was pending, the Board, at Dannenberg's 2001 parole hearing, again found him unsuitable for parole.

In 2002, the First District Court of Appeal filed an opinion reversing in part and affirming in part the Marin County Superior Court's decision. It concluded that, "when determining a life prisoner's parole suitability, the Board must first compare his or her crime against other similar offenses of the same class, taking into account the minimum term to which the inmate was sentenced. The Board may not continue to find an inmate unsuitable under section 3041, subdivision (b), without considering whether the term he or she is serving is disproportionate to the seriousness of the commitment offense, and to the terms served for other similar crimes. The commitment offense will justify a finding of unsuitability only if it is particularly egregious by these standards. [The First District concluded that t]he Board erred by failing to conduct such a comparative analysis before finding Dannenberg unsuitable." (*Dannenberg, supra*, 34 Cal.4th at p. 1076.) It ordered a new parole hearing at which such a comparison would be made.

The California Supreme Court granted review of the First District's decision "limited to" the question of "whether the Board may refuse a parole date [based solely on the gravity of the offense] only after evaluating the offender's crime against others of similar gravity and against its own uniform-term 'matrices,' and concluding that the offense is particularly egregious by those comparative standards, or whether it need conduct such a comparative analysis only after it determines that the inmate is suitable for parole." (*Dannenberg, supra*, 34 Cal.4th at pp. 1069, 1077.)

In January 2005, the California Supreme Court reversed the First District in a four-to-three decision. (*Dannenberg, supra*, 34 Cal.4th 1061.) It held that the Board is not required to conduct a comparative analysis before determining parole suitability. The California Supreme Court also clarified that a crime may be considered particularly egregious if the Board identifies "factors beyond the minimum elements of the crime for which the inmate was committed." (*Dannenberg*, at p. 1071.) "Here the Board's conclusion that Dannenberg remains too dangerous for parole because his offense was especially callous and cruel, and was committed for a trivial reason, relied upon facts beyond the minimum elements of second degree murder, and was supported by some evidence. The Board's decision to deny parole thus comports with the law." (*Ibid.*)

"Here, as in [*In re*] *Rosenkrantz* [(2002) 29 Cal.4th 616 [128 Cal.Rptr.2d 104, 59 P.3d 174]], the parole authority pointed to circumstances of the inmate's offense suggesting viciousness beyond the minimum elements of second degree murder. As the Board noted, Dannenberg reacted with extreme

and sustained violence to a domestic argument. He struck multiple blows to his wife's head with a pipe wrench. Bleeding profusely, she then 'fell or was pushed' into a bathtub full of water, where she drowned. Though he vehemently denied it, the evidence permitted an inference that, while the victim was helpless from her injuries, Dannenberg placed her head in the water, or at least left it there without assisting her until she was dead. . . .

"Thus, there clearly was 'some evidence' [citation] to support the Board's determination that Dannenberg's crime was 'especially callous and cruel,' showed 'an exceptionally callous disregard for human suffering,' and was disproportionate to the 'trivial' provocation. Accordingly, under *Rosenkrantz,* the Board could use the murder committed by Dannenberg as a basis to find him unsuitable, for reasons of public safety, to receive a firm parole release date." (*Dannenberg, supra,* 34 Cal.4th at p. 1095.)

Between the 2001 decision by the Board finding Dannenberg unsuitable for parole and the California Supreme Court's 2005 decision, Dannenberg waived parole hearings. After the California Supreme Court's January 2005 decision, the Board[1] again considered whether to grant Dannenberg parole. Dannenberg did not discuss the facts of the offense at this parole hearing. The Board concluded that Dannenberg was suitable for parole, calculated his term, and set a parole date.

The Governor reversed the Board's grant of parole. The Governor's decision expressly conceded that every factor other than the nature of the commitment offense favored Dannenberg's release on parole. "[Mr. Dannenberg] has no previous criminal history. And since his imprisonment, Mr. Dannenberg has maintained a blemish-free conduct record and has worked to enhance his ability to function within the law upon release. He has taken several college-level courses and has held skilled jobs such as Law Librarian, Custody Captain's Clerk, and Electronics Maintenance. He has availed himself of an array of self-help and therapy, including Alternatives to Violence, Advanced Alternatives to Violence, Breaking Barriers, and Advanced Breaking Barriers. He also has published more than 300 articles in *Prison Legal News,* has officiated Jewish sabbatical services, and has participated in the Men's Advisory Council. He has received favorable reports from various correctional and mental-health professionals, has maintained seemingly solid relationships with family while in prison, and has made realistic, confirmed plans upon parole to live with longtime friends and resume a career in the engineering field, in which he worked before the murder. These are all factors supportive of Mr. Dannenberg's release from prison to parole."

---

[1] The Board of Parole Hearings replaced the Board of Prison Terms in July 2005. (Pen. Code, § 5075, subd. (a).) We use "the Board" to refer to both entities, since they perform the same duties.

Dannenberg sought habeas corpus relief in the Santa Clara County Superior Court. The superior court denied his petition in March 2006. "Petitioner's procedural challenges have been rejected in *In re Rosenkrantz*[, *supra*,] 29 Cal.4th 616. And Petitioner's factual challenges have been rejected in *In re Dannenberg*[, *supra*,] 34 Cal.4th 1061. [¶] Pursuant to the California Supreme Court's analysis and decision in this case, there will always be some evidence that the crime is more than the minimum necessary for the second degree murder conviction and this will always be enough to deny Petitioner parole *for his second degree murder conviction.*" The court invited Dannenberg to contend that his offense was not especially egregious for a "first degree murder" and therefore that he should be released on parole because he had served enough time "within the matrix for first degree murder."

Dannenberg filed the instant petition for habeas corpus relief in this court in April 2006.[2] We issued an order to show cause in May 2007, and, in November 2007, we granted his petition, vacated the Governor's decision, and reinstated the Board's decision. The Governor petitioned for review, and the California Supreme Court granted review. In August 2008, the California Supreme Court decided *In re Lawrence* (2008) 44 Cal.4th 1181 [82 Cal.Rptr.3d 169, 190 P.3d 535] (*Lawrence*) and *In re Shaputis* (2008) 44 Cal.4th 1241 [82 Cal.Rptr.3d 213, 190 P.3d 573] (*Shaputis*), and it transferred this matter back to this court with directions to vacate our decision and reconsider the cause in light of those two decisions. The Governor and Dannenberg filed supplemental briefs in this court after the California Supreme Court transferred the matter back to this court.

## III. Discussion

### A. Standard of Review

"[T]he judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but . . . in conducting such a review, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation. If the decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole and thereafter to proceed in accordance with due process of law." (*In re Rosenkrantz, supra,* 29 Cal.4th at p. 658 (*Rosenkrantz*).)

---

[2] While this petition was pending, Dannenberg filed a habeas corpus petition in the California Supreme Court. (S146376, filed Sept. 7, 2006.) That petition was summarily denied by the California Supreme Court on December 13, 2006.

The same standard of review applies to a decision by the Governor that reverses a Board decision finding a prisoner suitable for parole. (*Rosenkrantz, supra,* 29 Cal.4th at p. 667.) "[A] parole decision by the Governor . . . [must] be based upon *the same factors the Board is required to consider.* Due process of law requires that this decision be supported by some evidence in the record. Only a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the Governor. As with the discretion exercised by the Board in making its decision, the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor, but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the Governor's decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the Governor's decision." (*Rosenkrantz,* at pp. 676–677, italics added.)

## B. Parole Suitability and Unsuitability Criteria

■ The general standard for a parole unsuitability decision is that "a life prisoner shall be found unsuitable for and denied parole if in the judgment of the [Board or the Governor] the prisoner will pose an unreasonable risk of danger to society if released from prison." (Cal. Code Regs., tit. 15, § 2402, subd. (a) (Regs.).[3])

■ "[C]ircumstances tending to establish unsuitability for parole are that the prisoner (1) committed the offense in an especially heinous, atrocious, or cruel manner; (2) possesses a previous record of violence; (3) has an unstable social history; (4) previously has sexually assaulted another individual in a sadistic manner; (5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison. (Cal. Code Regs., tit. 15, § 2402, subd. (c).)" (*Rosenkrantz, supra,* 29 Cal.4th at pp. 653–654, fn. omitted.) An offense is considered "especially heinous, atrocious, or cruel" if it "was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering" or "[t]he motive for the crime is inexplicable or very trivial in relation to the offense."[4] (Regs., § 2402, subd. (c)(1).)

---

[3] Subsequent references to "Regs." will be to this title.

[4] "Factors that support a finding that the prisoner committed the offense in an especially heinous, atrocious, or cruel manner include the following: (A) multiple victims were attacked, injured, or killed in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was

■ "[C]ircumstances tending to establish suitability for parole are that the prisoner: (1) does not possess a record of violent crime committed while a juvenile; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his life, especially if the stress has built over a long period of time; (5) committed the criminal offense as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) has engaged in institutional activities that indicate an enhanced ability to function within the law upon release. (Cal. Code Regs., tit. 15, § 2402, subd. (d).)" (*Rosenkrantz, supra*, 29 Cal.4th at p. 654.)

### C. Lawrence

Sandra Lawrence killed her lover's wife because her lover had decided not to leave his wife and children to be with Lawrence. Lawrence shot her lover's wife multiple times with a firearm and repeatedly stabbed her. After the crime, Lawrence fled. She surrendered to the police 11 years later, and was convicted of first degree murder. (*Lawrence, supra*, 44 Cal.4th at pp. 1192–1193.) During 23 years of imprisonment, Lawrence had a few administrative violations, but she was free of serious discipline. (*Lawrence*, at p. 1194.) Her psychological reports early on were troubling, but these reports improved over the years to the point that she was found to have no psychiatric or psychological disorder. (*Lawrence*, at pp. 1194–1195.) After about a decade in prison, a psychological report found that she no longer posed a significant danger to public safety. Numerous psychological reports over the next decade made the same finding. (*Lawrence*, at p. 1195.) During that same decade, the Board three times found Lawrence suitable for parole, but in each instance the Governor reversed. (*Lawrence*, at pp. 1195–1197.) In 2005, the Board granted parole for the fourth time, and the Governor reversed again. His reason for reversing the Board's 2005 parole grant was that the commitment offense had been " 'carried out in an especially cruel manner and committed for an incredibly petty reason.' " (*Lawrence*, at p. 1200.)

Lawrence filed a habeas corpus petition in the Court of Appeal challenging the Governor's reversal of the Board's 2005 grant of parole, and the Court of Appeal held that the Governor's decision was not supported by some evidence that she " 'presently represents an unreasonable risk to public safety

---

abused, defiled, or mutilated during or after the offense; (D) the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense." (*Rosenkrantz, supra*, 29 Cal.4th at p. 653, fn. 11.)

if released on parole.' " (*Lawrence, supra*, 44 Cal.4th at p. 1201.) The Court of Appeal vacated the Governor's reversal and reinstated the Board's grant of parole. (*Lawrence*, at p. 1201.) The California Supreme Court granted review and affirmed the Court of Appeal's decision. (*Lawrence*, at pp. 1201, 1229.)

■ The California Supreme Court's opinion in *Lawrence* explicitly recognized that "the core determination of 'public safety' under the statute and corresponding regulations involves an assessment of an inmate's *current* dangerousness." (*Lawrence, supra*, 44 Cal.4th at p. 1205.) Given this understanding, the court reconsidered its previous holding in *Dannenberg*. "[W]e presumed [in *Dannenberg*] that the evidence of egregiousness supported the ultimate determination that the inmate posed a threat to public safety, as opposed to merely providing support for the Board's or the Governor's conclusion that the crime was particularly aggravated." (*Lawrence*, at pp. 1207–1208.) The court concluded that this presumption was invalid, though the *Rosenkrantz* standard of review remained valid. "This [*Rosenkrantz*] standard [of review] is unquestionably deferential, but certainly is not toothless, and 'due consideration' of the specified factors requires more than rote recitation of the relevant factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision—the determination of current dangerousness." (*Lawrence*, at p. 1210.)

■ "[T]he statutory and regulatory mandate to normally grant parole to life prisoners who have committed murder means that, particularly after these prisoners have served their suggested base terms, *the underlying circumstances of the commitment offense alone rarely will provide a valid basis for denying parole when there is strong evidence of rehabilitation and no other evidence of current dangerousness.*" (*Lawrence, supra*, 44 Cal.4th at p. 1211, italics added.) The court acknowledged that it had not applied this standard in *Rosenkrantz* or *Dannenberg* because "we affirmed the Board's or the Governor's decision *without specifically considering* whether there existed a rational nexus between those egregious circumstances and the ultimate conclusion that the inmate remained a threat to public safety." (*Lawrence*, at p. 1213, italics added.)

■ "[A]n inquiry into whether the offense is more aggravated than the minimum elements necessary to sustain a conviction was not intended by this court to be the exclusive measure of due process, and has proved in practice to be unworkable, leading to arbitrary results. Most importantly, the circumstance that the offense is aggravated does not, in every case, provide evidence that the inmate is a current threat to public safety. Indeed, it is not the circumstance that the crime is particularly egregious that makes a prisoner unsuitable for parole—it is the implication concerning future dangerousness that derives from the prisoner having committed that crime. Because the

parole decision represents a prospective view—essentially a prediction concerning the future—and reflects an uncertain conclusion, rarely (if ever) will the existence of a single isolated fact in the record, evaluated in a vacuum, suffice to support or refute that decision." (*Lawrence, supra,* 44 Cal.4th at pp. 1213–1214.)

"Accordingly, we conclude that although the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's preincarceration or postincarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." (*Lawrence, supra,* 44 Cal.4th at p. 1214.) "Absent affirmative evidence of a change in the prisoner's demeanor and mental state, the circumstances of the commitment offense may continue to be probative of the prisoner's dangerousness for some time in the future. At some point, however, when there is affirmative evidence, based upon the prisoner's subsequent behavior and current mental state, that the prisoner, if released, would not currently be dangerous, his or her past offense may no longer realistically constitute a reliable or accurate indicator of the prisoner's current dangerousness." (*Lawrence,* at p. 1219.)

"[T]he relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense. This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude." (*Lawrence, supra,* 44 Cal.4th at p. 1221.) "In sum, the Board or the Governor may base a denial-of-parole decision upon the circumstances of the offense, or upon other immutable facts such as an inmate's criminal history, but some evidence will support such reliance *only* if those facts support the ultimate conclusion that an inmate *continues* to pose an unreasonable risk to public safety. (Regs., § 2281, subd. (a).) Accordingly, the relevant inquiry for a reviewing court is not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor." (*Lawrence,* at p. 1221.)

The California Supreme Court proceeded to apply this standard of review to the Governor's decision to deny Lawrence parole. "In light of petitioner's extraordinary rehabilitative efforts specifically tailored to address the circumstances that led to her criminality, her insight into her past criminal behavior, her expressions of remorse, her realistic parole plans, the support of her family, and numerous institutional reports justifying parole, as well as the favorable discretionary decisions of the Board at successive hearings—decisions reversed by the Governor based solely upon the immutable circumstances of the offense—we conclude that the unchanging factor of the gravity of petitioner's commitment offense has no predictive value regarding her *current* threat to public safety, and thus provides no support for the Governor's conclusion that petitioner is unsuitable for parole at the present time." (*Lawrence, supra,* 44 Cal.4th at p. 1226.)

■ "Our deferential standard of review requires us to credit the Governor's findings if they are supported by a modicum of evidence. (*Rosenkrantz, supra,* 29 Cal.4th at p. 658.) This does not mean, however, that evidence suggesting a commitment offense was 'especially heinous' or 'particularly egregious' will eternally provide adequate support for a decision that an inmate is unsuitable for parole. As set forth above, the Legislature specifically contemplated both that the Board 'shall normally' grant a parole date, and that the passage of time and the related changes in a prisoner's mental attitude and demeanor are probative to the determination of current dangerousness. When, as here, all of the information in a postconviction record supports the determination that the inmate is rehabilitated and no longer poses a danger to public safety, and the Governor has neither disputed the petitioner's rehabilitative gains nor, importantly, related the commitment offense to current circumstances or suggested that any further rehabilitation might change the ultimate decision that petitioner remains a danger, mere recitation of the circumstances of the commitment offense, absent articulation of a rational nexus between those facts and current dangerousness, fails to provide the required 'modicum of evidence' of unsuitability." (*Lawrence, supra,* 44 Cal.4th at pp. 1226–1227.)

"Accordingly, under the circumstances of the present case—in which the record is replete with evidence establishing petitioner's rehabilitation, insight, remorse, and psychological health, and devoid of any evidence supporting a finding that she continues to pose a threat to public safety—petitioner's due process and statutory rights were violated by the Governor's reliance upon the immutable and unchangeable circumstances of her commitment offense in reversing the Board's decision to grant parole. . . . Accordingly, the Governor's decision is not supported by 'some evidence' of current dangerousness and is properly set aside by this court." (*Lawrence, supra,* 44 Cal.4th at p. 1227.)

The court noted the limited nature of its holding. "In some cases, such as those in which the inmate has failed to make efforts toward rehabilitation, has continued to engage in criminal conduct postincarceration, or has shown a lack of insight or remorse, the aggravated circumstances of the commitment offense may well continue to provide 'some evidence' of current dangerousness even decades after commission of the offense." (*Lawrence, supra*, 44 Cal.4th at p. 1228.)

## D.  *Shaputis*

The California Supreme Court's decision in *Shaputis* provided a counterpoint to *Lawrence*, and explained how the egregious nature of the commitment offense could combine with other evidence to demonstrate the prisoner's current dangerousness despite the passage of a long period of time, thereby supporting a decision to deny parole.

Shaputis murdered his second wife by firing a single shot from a handgun into her neck at close range. (*Shaputis, supra*, 44 Cal.4th at pp. 1247–1248.) Shaputis claimed that the shooting was an accident, which the evidence overwhelmingly refuted. (*Shaputis*, at p. 1249.) He had a long history of domestic violence, including violence against his first wife and daughters, and many years of violent abuse of, and threats toward, his second wife prior to her death. (*Shaputis*, at pp. 1246–1247.) His prior criminal conduct included a sexual assault on his daughter. Shaputis also had a history of alcohol abuse and was intoxicated on the night of the murder. Although he acknowledged being an alcoholic, "he considers himself to be a 'mellow . . . outgoing' drinker." (*Shaputis*, at p. 1248.) Shaputis remained discipline free throughout his incarceration, but psychological reports indicated that there was a " 'schizoid quality to his interpersonal relationships.' " (*Shaputis*, at pp. 1249–1250, 1251.)

The Board denied parole in 2004 based on the egregiousness of the offense and his history of unstable relationships. (*Shaputis, supra*, 44 Cal.4th at pp. 1250–1251.) However, he petitioned for a writ of habeas corpus, and the Court of Appeal ordered a new hearing at which the Board could base a denial of parole only on new or different evidence. The Board then reluctantly granted parole. The Governor reversed. The basis for the Governor's reversal was his finding that Shaputis remained a danger to society due to the aggravated nature of the crime, which included premeditation, and his lack of insight into both the murder and the years of domestic violence that preceded the murder. (*Shaputis*, at pp. 1251–1253, 1255.) The Court of Appeal granted Shaputis's writ petition, and the California Supreme Court granted review. (*Shaputis*, at pp. 1253–1254.)

On review, the California Supreme Court reiterated the *Rosenkrantz* standard of review that it had applied in *Lawrence*. "When a court reviews the record for some evidence supporting the Governor's conclusion that a petitioner currently poses an unreasonable risk to public safety, it will affirm the Governor's interpretation of the evidence so long as that interpretation is reasonable and reflects due consideration of all relevant statutory factors." (*Shaputis, supra*, 44 Cal.4th at p. 1258.) The court distinguished *Lawrence*. "This is not a case, like *Lawrence, supra*, 44 Cal.4th 1181, 1225, in which the commitment offense was an isolated incident, committed while petitioner was subject to emotional stress that was unusual or unlikely to recur. [Citation.] Instead, the murder was the culmination of many years of petitioner's violent and brutalizing behavior toward the victim, his children, and his previous wife. [¶] The record establishes, moreover, that although petitioner has stated that his conduct was 'wrong,' and feels some remorse for the crime, he has failed to gain insight or understanding into either his violent conduct or his commission of the commitment offense. Evidence concerning the nature of the weapon, the location of ammunition found at the crime scene, and petitioner's statement that he had a 'little fight' with his wife support the view that he killed his wife intentionally, but as the record also demonstrates, petitioner *still* claims the shooting was an *accident*. This claim, considered with evidence of petitioner's history of domestic abuse and recent psychological reports reflecting that his character remains unchanged and that he is unable to gain insight into his antisocial behavior despite years of therapy and rehabilitative 'programming,' all provide some evidence in support of the Governor's conclusion that petitioner remains dangerous and is unsuitable for parole." (*Shaputis*, at pp. 1259–1260, fn. omitted.)

### E.   The Case Before Us

The Governor's decision in this case was that Dannenberg "pose[s] an unreasonable risk of danger to society if released from prison" due to the fact that his offense was "especially heinous." The question is whether there is "some evidence" that the heinousness of the commitment offense supports a conclusion that Dannenberg *currently* poses an unreasonable risk of danger to society if released.

Our record contains no more support for a finding that Dannenberg is currently dangerous than did the record in *Lawrence*. Here, the Governor explicitly conceded that the presence of every relevant suitability factor and the absence of any unsuitability factor, but for the nature of the commitment offense, supported a finding that Dannenberg was suitable for parole. The undisputed evidence supports the Governor's concession. Dannenberg has never committed any crime other than the commitment offense. His social history is extremely stable, and he has remained close to his family throughout his incarceration. The psychological reports have repeatedly found that he

does not suffer from any mental problems. His prison record is spotless, and he has made realistic and solid parole plans. Dannenberg has spent his time in prison acquiring new skills and additional education, and employing his skills and education in numerous valuable jobs. His work has been repeatedly praised. Dannenberg has taken every available opportunity to obtain therapy and to learn skills for avoiding violence, and he has long expressed remorse for the commitment offense.

Under *Lawrence*, we must conclude that the Governor's decision is not supported by some evidence. Indeed, it is arguable that the record before us even more strongly negates current dangerousness than did the record in *Lawrence*. Lawrence's crime was a premeditated first degree murder, while Dannenberg's crime was an unpremeditated second degree murder. Lawrence had some administrative violations in prison; Dannenberg's prison record is completely spotless. Lawrence's early psychological reports were troubling, but all of Dannenberg's psychological reports have found him to suffer from no mental problems.

Every one of the observations that the California Supreme Court made in *Lawrence* is applicable here to Dannenberg. "[T]he underlying circumstances of the commitment offense alone rarely will provide a valid basis for denying parole when there is strong evidence of rehabilitation and no other evidence of current dangerousness." (*Lawrence, supra*, 44 Cal.4th at p. 1211.) Here, as in *Lawrence*, there is uncontradicted evidence of Dannenberg's rehabilitation and no other evidence that he currently poses a danger to society.

The nature of the commitment offense "does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." (*Lawrence, supra*, 44 Cal.4th at p. 1214.) There is nothing in Dannenberg's spotless preincarceration or postincarceration history, or his current demeanor or mental state, to indicate that the nature of his commitment offense remains probative of his dangerousness.

"[W]hen there is affirmative evidence, based upon the prisoner's subsequent behavior and current mental state, that the prisoner, if released, would not currently be dangerous, his or her past offense may no longer realistically constitute a reliable or accurate indicator of the prisoner's current dangerousness." (*Lawrence, supra*, 44 Cal.4th at p. 1219.) Such is the case here. Dannenberg's behavior during the many years since his offense, and his

current mental state, demonstrate that his past offense is no longer a realistic indicator of his current dangerousness.

Like Lawrence, Dannenberg has engaged in extensive rehabilitation, gained insight into his offense, expressed remorse, and made realistic parole plans. As was true with Lawrence, he has the support of his family, and many institutional reports unqualifiedly support his parole. (*Lawrence, supra,* 44 Cal.4th at p. 1226.) Our record, like that in *Lawrence,* "is replete with evidence establishing petitioner's rehabilitation, insight, remorse, and psychological health, and devoid of any evidence supporting a finding that [he] continues to pose a threat to public safety . . . ." (*Lawrence,* at p. 1227.)

"When, as here, all of the information in a postconviction record supports the determination that the inmate is rehabilitated and no longer poses a danger to public safety, and the Governor has neither disputed the petitioner's rehabilitative gains nor, importantly, related the commitment offense to current circumstances or suggested that any further rehabilitation might change the ultimate decision that petitioner remains a danger, mere recitation of the circumstances of the commitment offense, absent articulation of a rational nexus between those facts and current dangerousness, fails to provide the required 'modicum of evidence' of unsuitability." (*Lawrence, supra,* 44 Cal.4th at pp. 1226–1227.) The Governor has conceded Dannenberg's rehabilitative gains, and has not attempted to articulate a rational nexus between Dannenberg's commitment offense and his current dangerousness.

On this basis, we can only conclude, as the California Supreme Court did in *Lawrence,* that "petitioner's due process and statutory rights were violated by the Governor's reliance upon the immutable and unchangeable circumstances of [his] commitment offense in reversing the Board's decision to grant parole," and "the Governor's decision is not supported by 'some evidence' of current dangerousness and is properly set aside by this court." (*Lawrence, supra,* 44 Cal.4th at p. 1227.)

The Governor relies on *Shaputis* and argues that there is some evidence in the record that Dannenberg is unsuitable for parole due to his "lack of insight" into the commitment offense. He cites to no *evidence* whatsoever in the record to support this contention.[5] Indeed, all of the psychological reports reflect that Dannenberg has gained a great deal of insight into his offense over the years, and has acquired skills to enable him to avoid violence in the future. All of these reports have found that he has no need for further therapy.

---

[5] The Governor purports to find support for his conclusion in "the District Attorney's opinion" that Dannenberg lacks sufficient insight into his crime. The district attorney's "opinion," like the Governor's belief, is not *evidence,* and therefore does not constitute "some evidence" supporting the Governor's decision.

The Governor's reliance on *Shaputis* is inapt. In *Shaputis*, the Governor's finding that Shaputis lacked insight into his offense was supported by psychological reports and other evidence that Shaputis, an alcoholic with "schizoid" tendencies, continued to deny responsibility for committing the offense. There was also a great deal of evidence that Shaputis had a long history of violence, which he also denied. Here, the Governor's unsupported belief that all of the psychological reports are wrong does not constitute "some *evidence*" that Dannenberg currently poses an unreasonable risk of danger to society.

While Dannenberg's commitment offense was grave, the record that was before the Governor lacks *any* evidence that now, more than two decades after his offense, the nature of Dannenberg's offense alone *continues* to support a conclusion that he poses an unreasonable risk of danger to society if released. It is not the mere passage of time that deprives Dannenberg's commitment offense of predictive value with respect to the risk he may pose to society. The quantity and quality of Dannenberg's consistent and spotless record of upstanding conduct for the last 23 years, coupled with the absence of any negative factors and the presence of every conceivable favorable factor, combine to eliminate any modicum of predictive value that his commitment offense once had.

### IV. No Basis for Remand to Governor

The Governor's reversal of the Board's decision to grant parole is not supported by some evidence and cannot be upheld. The Governor contends that we should remand this matter to him for further review. He does *not* contend that there is any new evidence or any additional basis upon which his decision to reverse the Board's decision could be upheld.

Both the Second District Court of Appeal and the Third District Court of Appeal have rejected the contention that a remand to the Governor is appropriate under these circumstances. "Because we have reviewed the materials that were before the Board and found no evidence to support a decision other than the one reached by the Board, a remand to the Governor would amount to an idle act. (See *In re Smith* (2003) 109 Cal.App.4th 489, 507 [134 Cal.Rptr.2d 781].)" (*In re Aguilar* (2008) 168 Cal.App.4th 1479, 1491 [86 Cal.Rptr.3d 498].) "[W]here, as here, it is determined there is not 'some evidence' in the record to support the Governor's decision to overrule the Board's grant of parole, the proper remedy is to vacate the Governor's decision and to reinstate that of the Board." (*In re Burdan* (2008) 169 Cal.App.4th 18, 39 [86 Cal.Rptr.3d 549].)

As in *Aguilar* and *Burdan*, we have reviewed the materials that were before the Board and have found no evidence that could support a decision other

than the one reached by the Board. Consequently, there is not some evidence to support the Governor's decision to reject the Board's grant of parole, and the appropriate remedy is to vacate the Governor's decision and reinstate the Board's decision.

## V. Disposition

Dannenberg's petition is granted. The Governor's decision is vacated, and the Board's decision is reinstated. This opinion is made final as to this court immediately upon its filing. (Cal. Rules of Court, rule 8.387(b)(3)(A).)

Premo, Acting P. J., and McAdams, J., concurred.