Gary MILOT, Petitioner,

v.

Brian HAWS, Warden, Respondent.

Case No. CV 08–3814–SGL (RNB).

United States District Court,
C.D. California,
Southern Division.

June 8, 2009.

Roger S. Hanson, Roger S. Hanson Law Offices, Santa Ana, CA, for Petitioner.

Linnea Daya Piazza, Office of Attorney General of California, San Diego, CA, for Respondent.

## ORDER ADOPTING FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

STEPHEN G. LARSON, District Judge.

Pursuant to 28 U.S.C. § 636, the Court has reviewed the pleadings and papers herein, including the Magistrate Judge's Report and Recommendation. Objections to the Report and Recommendation have been filed by respondent, and the Court has made a *de novo* determination of those portions of the Report and Recommendation to which objections have been made.

**1. *Respondent's objection to the Magistrate Judge's finding that petitioner has a liberty interest in parole suitability***

Respondent contends that petitioner "failed to present a federal question for habeas corpus review because he does not have a federally protected liberty interest in parole release." (*See* Objs. at 2). As respondent is compelled to acknowledge, however, Ninth Circuit cases have repeatedly held that, as a matter of clearly established Supreme Court law, California's parole scheme gives rise to a cognizable liberty interest in release on parole that is protected by the Due Process Clause. *See Irons v. Carey,* 505 F.3d 846, 850 (9th Cir.2007) (as amended), *denial of rehearing en banc at* 506 F.3d 951 (9th Cir.2007); *Sass v. Cal. Bd. of Prison Terms,* 461 F.3d 1123, 1128 (9th Cir.2006); *McQuillion v. Duncan,* 306 F.3d 895, 901–02 (9th Cir.2002); *see also Caswell v. Cal-*

*deron,* 363 F.3d 832, 838 (9th Cir.2004); *Biggs v. Terhune,* 334 F.3d 910, 914 (9th Cir.2003).

Respondent's objection based on the pendency of *Hayward v. Marshall,* 512 F.3d 536 (9th Cir.), *reh'g en banc granted,* 527 F.3d 797 (2008), must also be rejected. While the *Hayward* en banc panel may overrule earlier Ninth Circuit decisions, until such time if any as the *Hayward* en banc panel does so, this Court is bound to follow existing Circuit precedent in the absence of an intervening contrary Supreme Court decision. Respondent is unable to point to any such intervening contrary Supreme Court decision.

Finally, to the extent respondent contends that California's parole scheme does not give rise to any liberty interest in the setting of a parole date (*see* Objs. at 4), the California Supreme Court has held otherwise. *See In re Lawrence,* 44 Cal.4th 1181, 1212, 82 Cal.Rptr.3d 169, 190 P.3d 535 (2008) ("In *Rosenkrantz, supra,* 29 Cal.4th 616, 128 Cal.Rptr.2d 104, 59 P.3d 174, we expressly recognized that judicial review of a Governor's parole decision for adherence to both statutory and constitutional mandates was both (a) contemplated by the governing statutes and the California Constitution, and (b) integral to protecting an inmate's constitutional liberty interest in the setting of a parole date.").

**2. *Respondent's objection to the Magistrate Judge's application of the California Supreme Court's state standard of judicial review to litigate whether the state court decisions were contrary to or an unreasonable application of clearly established United States Supreme Court law***

Respondent divides this section of the Objections into three subsections.

*A.* In subsection A, respondent contends that the "some evidence" standard of review is not clearly established Supreme

Court law in the parole suitability context. (*See* Objs. at 5). However, Ninth Circuit cases have held otherwise. Specifically, the Ninth Circuit repeatedly has held that, as a matter of clearly established Supreme Court law, the Board's or Governor's decision to deny parole must be supported by "some evidence" with some indicia of reliability and cannot otherwise be arbitrary, as a matter of clearly established Supreme Court law. *See Irons,* 505 F.3d at 851; *Sass,* 461 F.3d at 1129 (quoting *Superintendent v. Hill,* 472 U.S. 445, 457, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)); *Jancsek,* 833 F.2d at 1390 (adopting the *Hill* standard); *see also Biggs,* 334 F.3d at 915; *McQuillion,* 306 F.3d at 904. Until such time as the cases so holding are overruled by an en banc Ninth Circuit decision or the Supreme Court has issued a contrary intervening decision, this Court is bound to follow those cases.

*B.* In subsection B, respondent contends that there is no clearly established federal law holding that a parole suitability decision relying on the commitment offense and other pre-offense factors to deny parole violates federal due process. (*See* Objs. at 6–8). This is a red herring argument because the Magistrate Judge acknowledged this fact in his Report and Recommendation. (*See* R & R at 1159–73).

*C.* In subsection C, respondent contends that the California Supreme Court's decision in *Lawrence* has no bearing on whether relief should be granted under the AEDPA. (*See* Objs. at 8–10). This Court disagrees. Under *Irons,* the analysis of whether the Board's or the Governor's unsuitability determination is supported by "some evidence" is framed by the "statutes and regulations governing parole suitability" determinations in California. 505 F.3d at 851. First, this Court must determine the findings "necessary to deem a prisoner

unsuitable for parole." Then, this Court must review the record to determine whether the state court's decision holding that these findings were supported by "some evidence" constituted an unreasonable application of the "some evidence" standard. *See id.* at 851. In *Lawrence,* the California Supreme Court clarified what findings are necessary to deem a prisoner unsuitable for parole under California's statutes and regulations governing parole suitability. This Court is bound by the California Supreme Court's construction of its own laws. *See Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *see also Bradshaw v. Richey,* 546 U.S. 74, 76, 126 S.Ct. 602, 604, 163 L.Ed.2d 407 (2005).

Notably, a number of other federal district courts in California have come to the same conclusion that, under *Irons, Lawrence* governs the application of the "some evidence" standard. *See, e.g., Adams v. Schwartz,* 2008 WL 4224561, at *12–*13 (E.D.Cal. Sept. 12, 2008) (granting habeas relief, citing *In re Lawrence* and describing some evidence standard as requiring that "an inmate poses a current threat to public safety, rather than some evidence of the existence of a statutory unsuitability factor"), Report and Recommendation adopted at 2008 WL 4601088 (Oct. 14, 2008); *Tash v. Curry,* 2008 WL 3984597, at *4, *10–*12 (N.D.Cal. Aug. 27, 2008) (granting habeas relief, citing *Irons's* direction to look to California law and analogizing case to *In re Lawrence* ): *see also Ortega v. Dexter,* 2008 WL 5263833, at *6 (C.D.Cal. Dec. 16, 2008) (denying habeas relief, but citing *In re Lawrence* and describing some evidence standard as "not whether the evidence supported any particular factor regarding parole suitability,

but rather whether 'some evidence' indicates the prisoner's release unreasonably would endanger public safety").

In addition, there have been at least two other cases that post-dated the Magistrate Judge's Report and Recommendation in which the district courts came to the same conclusion regarding *Lawrence. See Moore v. Marshall,* No. EDCV 07–1481–MMM (CT), 2009 WL 363280, at *1 (C.D.Cal. Feb. 12, 2009) (denying habeas relief, but rejecting respondent's argument that *Lawrence* "does not impact" petitioner's request for habeas relief since *Irons* directs that the federal court's analysis of some evidence is framed by state law); *Ally v. Mendoza–Powers,* No. 1:06–CV–00414 AWI JMD HC, 2008 WL 4330404, at *4, *6 (E.D.Cal. Sept. 18, 2008) (denying habeas relief, but recognizing that *Lawrence* constitutes part of California law that frames application of some evidence standard under *Irons* ). Report and Recommendation adopted at 2009 WL 196335 (Jan. 28, 2009).

### 3. *Respondent's objection to the Magistrate Judge's proposed remedy*

Respondent contends that the remedy ordered is improper for several reasons. First, while acknowledging that there is "no decisional law on point," respondent contends that "related federal authorities" suggest that an inmate's remedy is limited to a new parole consideration hearing before the Board that comports with due process. Second, respondent contends that under "Marsy's Law" (passed by voters in the November, 2008, election),[1] the Board is required to provide 90 days' notice to the victim's next of kin and that the recommended order for the hearing to be

---

1. Proposition 9, *inter alia,* amended Cal.Penal Code § 3043(a)(1), effective November 5, 2008, to provide the victim or next of kin, upon request, 90 days notice of "any hearing to review or consider the parole suitability or the setting of a parole date for any prisoner in a state prison shall."

held within 30 days is an insufficient amount of time for the Board to comply with that notice provision. Finally, respondent contends that, since conditions and length of a state parole term are matters of state law, this Court cannot order that petitioner be credited time against his parole term. (*See* Objs. at 10–12).

■ As to respondent's first contention, federal habeas courts have "broad discretion in conditioning a judgment granting habeas relief" and in "dipos[ing] of habeas corpus matters 'as law and justice require.'" *See Hilton v. Braunskill,* 481 U.S. 770, 775, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987); *Burnett v. Lampert,* 432 F.3d 996, 999 (9th Cir.2005) (federal courts "have a fair amount of flexibility in fashioning specific habeas relief"); *Sanders v. Ratelle,* 21 F.3d 1446, 1461 (9th Cir.1994) ("A federal court is vested with the largest power to control and direct the form of judgment to be entered in cases brought up before it on habeas corpus.") (internal quotations and citations omitted).

In the context of parole decisions that violate due process, there is no federal law holding that the only remedy available to a federal habeas court is a remand to the Board for a new hearing. Indeed, in *McQuillion v. Duncan,* 342 F.3d 1012, 1015 (9th Cir.2003), where the Ninth Circuit affirmed the district court's finding that the Board's 1994 parole grant was rescinded in violation of due process, the Ninth Circuit upheld the district court's order requiring the inmate's immediate release.[2] *See also Adams v. Schwartz,* No. CIV S–05–2237 JAM JFM P, 2008 WL 4224561, at *16 (E.D.Cal. Sept. 12, 2008) (petitioner ordered immediately released

where 2002 parole grant was rescinded in violation of due process), Report and Recommendation adopted at 2008 WL 4601088 (Oct. 14, 2008); *Opalec v. Curry,* 556 F.Supp.2d 1036, 1045 (N.D.Cal.2008) (district court ordered Board to calculate a term and set a release date within 60 days of the order); *Masoner v. State,* No. CV 03–1261–ER, 2004 WL 1080177, at *2 (C.D.Cal. Jan. 23, 2004) (district court ordered Board to grant inmate a parole date within 30 days "unless legitimate post-conviction evidence [could] be found to suggest that his release would pose a danger to public safety").

Additionally, respondent's assertion that "California law supports the proposition that the proper remedy for a violation of due process is remand to the Board to hold a new hearing in accordance with due process without restriction" (*see* Objs. at 11 at n. 6) cannot be reconciled with recent decisions by California appellate courts that have not remanded to the Board to hold a new hearing "in accordance with due process without restriction." *See, e.g., In re Rico,* 171 Cal.App.4th 659, 689, 89 Cal. Rptr.3d 866 (2009) (rejecting same contention as respondent is making here and directing Board to conduct a new parole suitability hearing within 30 days and to find petitioner suitable for parole "unless either previously undiscovered evidence or new evidence subsequent to the 2007 parole hearing, regarding his conduct, circumstances, or change in his mental state, supports a determination that he currently poses an unreasonable risk of danger to society if released on parole"); *In re Gaul,* 170 Cal.App.4th 20, 87 Cal.Rptr.3d 736 (2009) (directing Board to hold new hearing within 30 days of finality of decision

**2.** Respondent attempts to distinguish *McQuillion* on the basis that there the inmate already had been found suitable for parole and the issue was the propriety of a parole rescission hearing after the parole grant. It is a distinc-

tion without a difference. Here, as in *McQuillion,* the issue presented is whether the decision that led to the petitioner's continued incarceration was supported by "some evidence."

and to find inmate suitable for parole unless new evidence of conduct or change in mental state after 2007 parole consideration hearing is introduced and is sufficient to support a finding of current dangerousness); *In re Singler,* 169 Cal. App.4th 1227, 87 Cal.Rptr.3d 319 (2008) (same remedy, where as here petitioner had never before been found suitable); *see also In re Vasquez,* 170 Cal.App.4th 370, 387, 87 Cal.Rptr.3d 853 (2009) (reversing Governor's decision overturning Board's parole grant and reinstating Board's parole release order); *In re Aguilar,* 168 Cal.App.4th 1479, 1491, 86 Cal.Rptr.3d 498 (2008) (reversing Governor's decision overturning parole grant, reinstating Board's parole release date, and ordering inmate released forthwith pursuant to conditions set forth in Board's 2005 decision finding inmate suitable for parole).[3]

With respect to respondent's second argument, there appears to be no reason to allow the Board 120 days, as respondent requests, "to allow the Board sufficient time to comply with Marsy's Law." In the first place, the hearing on remand will be limited only to finding petitioner suitable for parole in the absence of any evidence since his 2007 hearing that is sufficient to support an unsuitability finding. The victim's family is not likely to have anything relevant to contribute on whether any evidence *since his 2007* hearing supports an unsuitability finding. Second, California state courts are not giving Boards periods of time long enough to comply with Marsy's Law. *See, e.g., In re Rico,* 171 Cal. App.4th at 688–89, 89 Cal.Rptr.3d 866 (giving Board 30 days); *In re McGraw,* 2009 WL 405307, at *6 (Feb. 19, 2009) (giving Board 60 days); *Gaul,* 170 Cal.App.4th at 41, 87 Cal.Rptr.3d 736 (giving Board 30 days); *Singler,* 169 Cal.App.4th at 1245, 87 Cal.Rptr.3d 319 (giving Board 30 days).

Finally, as for respondent's contention that this Court has no authority to credit petitioner for time spent on parole, the Ninth Circuit has held otherwise:

> The Warden argues that, at a minimum, McQuillion should not be released immediately without an accompanying three-year period of parole. This argument overlooks the fact that if McQuillion had been released on the date to which he was entitled, he would have been released in May 1994. The three-year parole, which he would have been required to serve if he had been released on time, has long since passed.

*McQuillion,* 342 F.3d at 1015; *see also Burnett,* 432 F.3d at 1000 (noting that had

---

**3.** In fact, the futility of remanding a parole case for "re-review" when the habeas court already has reviewed the evidence and found it insufficient to sustain an unsuitability finding has not escaped the state or federal courts. *See Blankenship v. Kane,* No. C 04–5450 CW, 2007 WL 2214102, at *3–*4 (N.D.Cal. July 30, 2007) (amending district court's own original order so that Governor was not given opportunity to re-review Board's suitability finding, adopting reasoning of state court decision that "since we have reviewed the materials that were before the Board and found no evidence to support a decision other than the one reached by the Board, a remand to the Governor … would amount to an idle act"); *Aguilar,* 168 Cal. App.4th at 1491, 86 Cal.Rptr.3d 498 (same).

The same rationale applies where the inmate has never been found suitable for parole and where the habeas court already has found the evidence before the Board panel insufficient to sustain the unsuitability finding. *See In re Burdan,* 169 Cal.App.4th 18, 39, 86 Cal. Rptr.3d 549 (2008) (rejecting warden's contention that governor should be given opportunity for further review since " 'to proceed in accordance with due process of law' [under *Rosenkrantz* ] does not mean the Board, or the Governor, is to be given an opportunity to reconsider the parole decision"). In other words, to allow the Board to re-assess the *same* evidence that the federal habeas court already has found does *not* provide some evidence of *petitioner's current dangerousness is* futile.

the Ninth Circuit in *McQuillion* not ordered the inmate immediately released, it would have been "essentially *lengthening*" his sentence by ordering him to serve a parole term where he already had served more time in prison than his "lawful period of imprisonment and parole combined"); *Tripp v. Cate,* No. C 07–05748 CW, 2009 WL 248368, at *12 (N.D.Cal. Feb. 2, 2009) (ordering Department of Corrections to calculate parole term based on 2004 suitability finding notwithstanding the fact that inmate was released in 2008).

**4.** ***Respondent's request for the Court to defer ruling on this matter until issuance of the Mandate in Hayward***

In the last section of Objections, respondent requests that this Court defer ruling on this matter until the final disposition of the en banc rehearing granted in *Hayward.* Respondent notes that the Ninth Circuit already has "stayed submission of roughly 90 pending cases until the resolution of Hayward," and that several district courts have issued stays in such matters. (*See* Objs. at 12–13).

Those district courts that have issued stays arguably have done so in contravention of the Ninth Circuit's decision in *Yong v. I.N.S.,* 208 F.3d 1116 (9th Cir.2000). There, the Ninth Circuit observed that "habeas proceedings implicate special considerations that place unique limits on a district court's authority to stay a case in the interests of judicial economy," and that "[s]pecial solicitude is required because the writ is intended to be a 'swift and imperative remedy in all cases of illegal restraint or confinement.'" *Id.* at 1120. The Ninth Circuit found that, although considerations of judicial economy are appropriate, they cannot justify an indefinite and potentially lengthy stay of a habeas proceeding. Consequently, the Ninth Circuit ruled that the district court abused its discretion in granting a stay pending a decision by the Supreme Court. See *id.* at 1120–21. This Court has waited long enough; a decision must issue.

Having made a *de novo* determination of those portions of the Report and Recommendation to which objections have been made, the Court concurs with and adopts the findings, conclusions, and recommendations of the Magistrate Judge, except with respect to the recommended form of relief as it relates to the issue of credit for parole. Although the Court concurs with the Magistrate Judge that the relief should place petitioner in the same position he would have been in if his due process rights had not been violated (*see Burnett v. Lampert,* 432 F.3d 996, 1000 (9th Cir. 2005); *McQuillion v. Duncan,* 342 F.3d 1012, 1015 (9th Cir.2003); *Tripp v. Cate,* No. C 07–05748 CW, 2009 WL 248368, at *12 (N.D.Cal. Feb. 2, 2009)), the Court disagrees with the Magistrate Judge's recommended wording of the form of relief.

IT THEREFORE IS ORDERED that:

1. Respondent's request that the Court defer ruling in this matter until the final disposition of *Hayward v. Marshall,* 512 F.3d 536 (9th Cir.), *reh'g en banc granted,* 527 F.3d 797 (2008), is denied. See *Yong v. I.N.S.,* 208 F.3d 1116, 1120–21 (9th Cir.2000).

2. Judgment be entered granting a writ of habeas corpus as follows: The Board shall find petitioner suitable for parole at a hearing to be held within 30 days of the finality of this decision, unless new evidence of his conduct in prison or change in mental status subsequent to the June 29, 2006 parole consideration hearing is introduced that is sufficient to support a finding that petitioner currently poses an unreasonable risk of danger to society if released on parole; and in the absence of any such new evidence showing petitioner's unsuitability for parole, the Board shall calculate a prison term and

release date for petitioner in accordance with California law. Further, if the release date already has passed, respondent shall, within ten (10) days of the Board's hearing, release petitioner from custody. With respect to his presumptive period of parole, petitioner is to be credited for any time that has lapsed since the release date calculated by the Board or November 27, 2006 (when a finding of suitability at the June 29, 2006 parole consideration hearing would have become final pursuant to Cal.Penal Code §§ 3041(b) and 3041.2(a)), whichever is later.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

ROBERT N. BLOCK, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable Stephen G. Larson, District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 194 of the United States District Court for the Central District of California.

## PROCEEDINGS

On June 11, 2008, petitioner (through counsel) filed a Petition for Writ of Habeas Corpus by a Person in State Custody ("Pet.") herein, along with several exhibits (hereinafter "Pet., Exh.—"). The Petition was directed to the California Board of Prison Terms [1] denial of parole at petitioner's twentieth parole consideration hearing held on June 29, 2006.

On June 30, 2008, respondent filed a "Request for Stay Pending Issuance of the Mandate in *Hayward* [*v. Marshall,* 512 F.3d 536 (9th Cir.2008), *reh'g en banc granted,* 527 F.3d 797 (2008) ]," or if the

Court denied a stay, a request for an extension of time to respond to the Petition. Petitioner filed opposition to the stay request on July 1, 2008, to which respondent filed a reply on July 11, 2008. On July 14, 2008, petitioner filed a response to the reply. In a Minute Order issued on July 16, 2008, the Court advised the parties of its inclination in light of *Yong v. I.N.S.,* 208 F.3d 1116 (9th Cir. 2000) (holding that court may not, in the interest of judicial economy, stay habeas petition over petitioner's objection) to deny respondent's stay request; however, based on its views (as of that time) as to the current state of the law regarding a California prisoner's federal due process rights relating to parole, the Court gave petitioner the opportunity to reconsider his opposition to the stay request. On July 22, 2008, petitioner filed a document captioned "Petitioner's Response to Court's Order of July 16, 2008" wherein he reaffirmed his opposition to a stay. The Court then denied respondent's stay request on July 23, 2008, but granted respondent's request for an extension of time to file a response to the Petition.

On September 23, 2008, respondent filed an Answer to Petition ("Ans.") and concurrently lodged various documents (hereinafter referred to as "Lodgment No.—"). On October 6, 2008, petitioner filed a Traverse ("Trav.") and a supporting Memorandum of Points and Authorities ("Trav. Mem.").

Thus, this matter now is ready for decision. For the reasons discussed hereafter, the Court recommends that habeas relief be granted.

## BACKGROUND

In 1976, by way of a guilty plea, petitioner was convicted of first degree murder

---

1. The Board of Prison Terms now is part of the California Board of Parole Hearings

(hereinafter the "Board").

with a gun use enhancement and three robberies. The trial court sentenced petitioner to state prison for an indeterminate term of 6 months-to-life [2] on the murder charge plus determinate terms for the robberies to run concurrently with the life term. (*See* Pet., Exhs. A, B). Petitioner's "minimum eligible parole date" was set at July 22, 1983.[3] (*See* Pet., Exh. C and Attachment to Lodgment 2 (hereinafter "Transcript") at 1).

Petitioner appeared before the Board for an initial parole consideration hearing and eighteen subsequent parole consideration hearings beginning in 1978 and was found to be unsuitable for parole at each of them. (*See* Pet. at 6, Exh. D). On June 29, 2006, petitioner appeared before a Board panel for his twentieth (overall) parole consideration hearing. The panel read into the record the following factual account of petitioner's crime, taken from the June 2006 Board summary of the crime:

"[O]n January 11, 1976, at the age of 18[,] Milot, in the company of his crime partner, Robert Giminez ... age 24, committed the robbery of the El Dotanjo [ph] Bar in East Los Angeles. The crime resulted in the shooting death of the victim, Portanato [ph] Rodriguez.... During the robbery, Inmate Milot brandished a .22 caliber rifle, which he pointed at the victim and witnesses, in order to gain their compliance, while his crime partner removed money from the register. Inmate Milot fired a shot from the rifle into the ceiling and then fired a shot at Laredo ... Medina Sot [sic], in order to get his compliance. Inmate Milot stated that he was not intending on shooting Soto [ph] but fired at his feet in order to get his attention. The victim, Rodriguez, then attempted to flee out of the back door of the El Dotanjo Bar. He was shot and killed by Inmate Milot with the .22 caliber rifle. Three shots were fired during the commission of the robbery. Count five of the commitment offense also involves the robbery of the victim, Marina del Rosario [ph] Enzunaza ... who was serving as a barmaid at the robbery, by—who was serving as a barmaid and was robbed by Inmate Milot and his crime partner. Mr. [sic] Enzunaza ... stated that Inmate Milot held everyone at bay with a .22 caliber rifle while his crime partner removed the money from the register. Count Eight relates to the robbery of the Starlight Bar on January 11, 1976 in East Los Angeles. Inmate Milot held—or again held a .22 caliber rifle while his partner removed money from the patrons at the bar. During the robbery, the victim McAcaosta ... was robbed while seated at the bar and a victim named Arthur Duminguez ... had his wallet removed." (Transcript at 9–11).

The panel also considered petitioner's version of the events from previous hearings:

---

**2.** Petitioner was sentenced pursuant to Cal.Penal Code § 1202b (repealed 1977), which gave discretion to the sentencing court to impose a minimum prison term of six months for certain felonies committed by a person under 23 years of age. *See People v. B.*, 24 Cal.3d 212, 216–17, 155 Cal.Rptr. 189, 594 P.2d 14 (1979).

**3.** *See, e.g., In re Rosenkrantz*, 80 Cal.App.4th 409, 414 n. 1, 95 Cal.Rptr.2d 279 (2000)

(explaining that the BPT's regulations for setting parole dates are found in title 15 of the Cal.Code of Regs., which defines "minimum eligible parole date" for life prisoners as the earliest date on which a prisoner legally may be released on parole), *overruled in part by In re Rosenkrantz*, 29 Cal.4th 616, 128 Cal. Rptr.2d 104, 59 P.3d 174 (2002), *cert. denied*, 538 U.S. 980, 123 S.Ct. 1808, 155 L.Ed.2d 669 (2003).

"Milot pleaded guilty in court to Murder in the First Degree with the use of a firearm and three counts of Robbery, First, with the use of a firearm. He has since acknowledged culpability of his crime and expresses remorseful feelings when questioned about his case. He relates that his attitude at the time of the offense was one of disregard for the feelings of others and that he—and that his—and that his was a[sic] motive to obtain recognition for his immediate peer group or from his immediate peer group. [ . . . ] The reality of the crime he committed did not actually hit him until court pleadings or proceedings, when he viewed the victim's wife, who was emotionally distraught. [ . . . ] The victims were not the only people traumatized that evening but also the other patrons of the El Dotanjo and Starlight Bars." (Transcript at 11–12).

Petitioner indicated that he wanted to tell the panel more about himself. He stated:

"Well, I'd like to tell you a little bit about myself at the time when all this happened. At the time, you know, I had a really low self-esteem and I had a pretty normal upbringing and childhood until the age of about 16, 17, when my parents started working. Both of them started working and they left the house. I was the only child. I had to come back to the house, I'd be alone and there was nobody there. And I started seeking out the attention of this negative group, negative peer group, if you want to call it that, and you know, I started hanging out with these guys. And as I said earlier, at the time I had a real low

self-esteem and I was doing whatever I could to get their attention and fall into favor with them and I was acting out and doing some really insane stuff back then." (Transcript at 12–13).

In response to the panel's inquiry, petitioner stated that he was not a member of any gang and that his 1974 juvenile record for robbery was "strong-arm" robbery without a weapon. Petitioner's juvenile record also reflected arrests for malicious mischief and grand theft auto. Petitioner's adult record also reflected an arrest for grand theft, related to the commitment offense. (*See* Transcript at 13–14). Petitioner's family re-located to Los Angeles from Montreal when he was two and his parents were self-employed in the photography business. His neighborhood was surrounded by gangs but he was not involved. Petitioner began drinking and acting out around age 16. Petitioner admitted he had an alcohol problem as a teenager. (*See* Transcript at 16).

The panel heard evidence of petitioner's prison disciplinary record, including several disciplinary reports (115s [4]) for narcotics paraphernalia, alcohol, and marijuana. Petitioner had sustained 20 115s until 1989, when he "starting growing up." Petitioner stated he started getting "away from all the crap," "made a decision to turn [his] life around," and got married to a nurse he met through his parents. (*See* Transcript at 17–18, 35). Petitioner also had sustained 26 negative chronos (128s [5]), the last of which was in May of 1998 for "refusing to lock up." (*See* Transcript at 35). In response to the panel's inquiry regarding whether petitioner wanted the

---

**4.** "When misconduct is believed to be a violation of law or is not minor in nature, it shall be reported on a CDC Form 115 (Rev. 7/88), Rules Violation Report." *See* Cal.Code Regs. tit. 15, § 3312(a)(3).

**5.** "When . . . minor misconduct recurs after verbal counseling or if documentation of minor misconduct is needed, a description of the misconduct and counseling provided shall be documented on a CDC Form 128–A, Custodial Counseling Chrono." *See* Cal.Code Regs. tit. 15, § 3312(a)(2).

panel to understand any other prior history, petitioner again spoke of the commitment offense. He stated, in part:

"I guess I wasn't getting the acceptance at home that a normal 16, 17 year-old kid would get. I had just turned 18 when this happened and I walked into the bar at that time and I had total disregard for other people's feelings. I only cared about myself. I was really screwed up at the time." (Transcript at 19).

Petitioner acknowledged that Mr. Soto "to this day" probably remembers being traumatized by what happened that day. Petitioner stated that he was not trying to minimize what happened, but he fired one shot at Mr. Rodriguez and it hit him, but petitioner did not know it. He stated he was trying to gain Rodriguez's compliance; he was not trying to hurt him and did not continue to fire shots at him. (*See* Transcript at 19–21).

The panel heard evidence that petitioner had plans to reside in a substance abuse program house for six months upon release, then reside with his wife in San Diego. Petitioner had saved $6,300 towards his financial support. Petitioner had employment offers with the transitional housing group and at a body shop in San Diego. (*See* Transcript at 23–28).

The panel also heard evidence that in prison, since petitioner's previous hearing, he had been involved in Convicts Reaching Out to People, for which he had earned a laudatory chrono from the associate warden, and also had been involved in NA and AA, for which he had earned multiple positive chronos. Petitioner also had worked as a counselor's clerk at the reception yard; had participated in CROP, talking to troubled kids; and had participated in the California Reads Program (literacy tutoring) and as an intern with SAP, mentoring inmates in the drug treatment program. (*See* Transcript at 29–32, 45).

Petitioner also had earned his GED while in prison and had attended some college level courses. (*See* Transcript at 36). Petitioner's most recent psychological evaluation was undertaken in July of 2004. The panel read into the record a portion of the evaluation:

"During the evaluation, the inmate exhibited considerable insight and maturity. In the past, he also displayed some signs of psychopathy, which have been reduced significantly for the past two decades. Such historic signs include—included shallow affect, callousness, a parasitic lifestyle, impulsivity and irresponsibility. At this time, his affect appeared to be fuller. He seemed to have developed a capacity for empathy. He has learned to control his impulses and he has gained in self-awareness and practical competencies. He has also exhibited considerable evidence of self-help orientation, including obtaining his GED and various vocational certificates, receiving satisfactory and better work ratings of the past decade. Participating in a variety of self-help therapeutic groups and developing the ability to reach out to others in more altruistic ways ... (such as his pro social environment in SAP and CROP at this time) ... The above information suggested that Mr. Milot presented as a low risk for violence. [¶] In this inmate's case, as he seemed well aware, the primary destabilizer would [ ] likely be substance abuse relapse. However, he seems to be focusing on this area intensely at this time and he appears to be using his newly gained information and skills in a positive way. He maintains personal support in the community and he indicated that his community relationships have assumed greater importance for him, as he has matured. His parole plans are detailed, feasible and appropriate. His functioning in the prison for the past

decade appeared to confirm his ability to comply with remediation efforts and he has made a considerable effort to address prior BPT recommendations. Given these factors, the probability of parole success seems good. Based on the above data, it appeared that Mr. Milot was at a low risk for future violence. [¶] Overall, risk assessment measures suggested that the inmate poses a low likelihood of becoming involved in a violent offense if released into the free community." (*See* Transcript at 36–39).

Petitioner discussed in greater detail his involvement in AA and NA. He acknowledged having a disease and stated that "you think that you got it licked and you come back and it bites you in the butt and it's something that I'm conscious of every day." He also stated that he removed himself from situations in prison where people were involved in or referenced drugs. He also stated that he had tried to make amends per "step eight" of the AA program, writing a letter for Mrs. Rodriguez, which he sent to the District Attorney's Office, and sending 20 percent of his paycheck to the Victims Fund. (*See* Transcript at 40–42).

In response to the Deputy District Attorney's questioning, petitioner admitted that a week after committing these robberies and murder, he committed another robbery with the same co-defendant. (*See* Transcript at 43). The Deputy District Attorney opposed parole on the basis of the commitment offense, petitioner's participation in the other robberies, and petitioner's prison disciplinary record. (*See* Transcript at 46–48). Petitioner's attorney gave an argument in closing supporting petitioner's release on parole (*see* Transcript at 48–55), as did petitioner, who expressed his remorse and committed himself to changing. Petitioner acknowledged that he was a "knucklehead" in prison "for

a long time" but "started digging [him]self out of the hole" and today is a "completely changed person." Petitioner described his "real" job in prison as a welder working 40 hours a week, his donations to the Victims' Fund, his work with kids in the CROP Program, and his eight years of recovery from substance abuse. He explained that he understood the risk of relapse and would see them coming from a mile away. Petitioner stated he felt like he was "ready to go home." (*See* Transcript at 56–59).

The Board panel concluded that petitioner was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. The panel cited the following circumstances in support of its decision: (1) the circumstances of the commitment offense, including (a) there were multiple victims, one of whom was killed; (b) the offense was carried out in an especially dispassionate manner; and (c) the motive for the crime was inexplicable in relation to the offense; (2) the murder did not prevent petitioner from committing other crimes, including two armed robberies; (3) petitioner's prior criminal conduct included violence and he failed to profit from previous attempts to correct his criminality—i.e., juvenile probation; and (4) petitioner had sustained 26 128 counseling chronos and 21 serious 115 disciplinary reports in prison. The panel found that the psychological report was supportive of release and that petitioner had appropriate parole plans. The panel also noted that the District Attorney opposed petitioner's parole. (*See* Transcript at 60–62). The panel indicated that it was moved by petitioner and his counsel's eloquent plea for release, but it noted that in petitioner's own words he had been a "knucklehead" in custody, earning 115s until 1989 and 128s until 1998. The panel commended petitioner for his significant change and indicated it hoped these gains would become

long term in nature. The panel commended petitioner for his participation in AA and NA and other self-help programs, and recommended that he remain disciplinary free and continue to participate in self-help. (*See* Transcript at 62–63).

Petitioner challenged the Board's denial of parole by way of a petition for writ of habeas corpus filed in the Los Angeles County Superior Court, which was denied on August 22, 2007. The Superior Court rejected the Board's finding that the motive for the crime was inexplicable, but found that the unsuitability finding was supported by some evidence given petitioner's institutional behavior and prior criminal record, his attack of multiple victims, and the finding that the crime was carried out in a dispassionate and calculated manner. (*See* Lodgment No. 1; Pet., Exh. E). Petitioner next filed a habeas petition in the California Court of Appeal on September 20, 2007, which was denied on January 24, 2008 after respondent filed an informal response, to which petitioner replied. (*See* Lodgment Nos. 3, 4, 5; Pet., Exh. F).[6] The California Supreme Court summarily denied petitioner's ensuing Petition for Review without comment or citation of authority on March 26, 2008. (*See* Lodgment No. 6; Pet., Exh. G).

The filing of the instant Petition followed.

## PETITIONER'S CLAIMS HEREIN

1. Denial of parole violated due process because the grounds recited by the panel and the findings in support were arbitrary, unsupported by any evidence, and/or inherent in all first degree murders. (*See* Pet. Mem. at 10–14; Trav. at 7–11).

2. The decision violated due process because the panel articulated no nexus between the immutable facts it recited and petitioner's current risk to public safety, the state's sole parole determinant. (*See* Pet. Mem. at 14–17; Trav. at 7–11).

3. Interminable denial of petitioner's parole based on outdated immutable facts violates due process by amending his prison term to life without any possibility of parole. (*See* Pet. Mem. at 17–21; Trav. at 11–12).

## STANDARD OF REVIEW

The standard of review applicable to petitioner's claims herein is set forth in 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

> "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."

 Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *see also Carey v. Musladin*, 549 U.S. 70, 127 S.Ct. 649, 653, 166 L.Ed.2d 482 (2006);

---

6. The Court has referred to the website of the California Appellate Courts for information relating to the denial of the habeas petition since neither party lodged the California Court of Appeal's denial order.

*Smith v. Patrick,* 508 F.3d 1256, 1260 (9th Cir.2007).

■ Although a particular state court decision may be both "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings. *See Williams,* 529 U.S. at 391, 413, 120 S.Ct. 1495. A state court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. *See Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam); *Williams,* 529 U.S. at 405–06, 120 S.Ct. 1495. When a state court decision adjudicating a claim is contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)." *Williams,* 529 U.S. at 406, 120 S.Ct. 1495. However, the state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early,* 537 U.S. at 8, 123 S.Ct. 362.

■■ State court decisions that are not "contrary to" Supreme Court law may only be set aside on federal habeas review "if they are not merely erroneous, but 'an *unreasonable* application' of clearly established federal law, or are based on 'an *unreasonable* determination of the facts.'" *Early,* 537 U.S. at 11, 123 S.Ct. 362 (citing 28 U.S.C. § 2254(d) and adding emphasis). A state court decision that correctly identified the governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case. *See*

Williams, 529 U.S. at 406–10, 413, 120 S.Ct. 1495 (*e.g.,* the rejected decision may state *Strickland* rule correctly but apply it unreasonably); *Woodford v. Visciotti,* 537 U.S. 19, 24–27, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam). However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." *Visciotti,* 537 U.S. at 24–27, 123 S.Ct. 357; *Williams,* 529 U.S. at 413, 120 S.Ct. 1495. An "unreasonable application" is different from an erroneous or incorrect one. *See Williams,* 529 U.S. at 409–10, 120 S.Ct. 1495; *see also Visciotti,* 537 U.S. at 25, 123 S.Ct. 357; *Bell v. Cone,* 535 U.S. 685, 699, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

## DISCUSSION

### A. *The Current State of the Law*

■ This Court views the current state of the law regarding a California prisoner's federal due process rights relating to parole as follows:

(a) As a matter of clearly established Supreme Court law, California's parole scheme gives rise to a cognizable liberty interest in release on parole that is protected by the Due Process Clause. *See Irons v. Carey,* 505 F.3d 846, 850 (9th Cir.2007) (as amended), *denial of rehearing en banc at* 506 F.3d 951 (9th Cir.2007); *Sass v. Cal. Bd. of Prison Terms,* 461 F.3d 1123, 1128 (9th Cir. 2006); *McQuillion v. Duncan,* 306 F.3d 895, 901–02 (9th Cir.2002); *see also Caswell v. Calderon,* 363 F.3d 832, 838 (9th Cir.2004); *Biggs v. Terhune,* 334 F.3d 910, 914 (9th Cir.2003).[7]

---

7. Although the Ninth Circuit has by now repeatedly held that there is a "clearly established" liberty interest in parole release, respondent would have this Court disregard these Ninth Circuit holdings. (*See* Ans. at 3).

This Court is bound by its Circuit's precedent in the absence of an intervening contrary Supreme Court decision, and respondent has pointed to no such decision.

(b) In the context of parole-related decisions, "the full panoply of rights due a defendant in [a criminal prosecution] is not constitutionally mandated." *Jancsek v. Oregon Board of Parole*, 833 F.2d 1389, 1390 (9th Cir.1987); *see also Pedro v. Oregon Parole Board*, 825 F.2d 1396, 1399 (9th Cir.1987), *cert. denied*, 484 U.S. 1017, 108 S.Ct. 726, 98 L.Ed.2d 675 (1988). A prisoner is entitled to notice of the hearing, an opportunity to be heard, and if parole is denied, a statement of the reasons for the denial. *See Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 16, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); *Jancsek*, 833 F.2d at 1390 (citing *Greenholtz*, 442 U.S. at 16, 99 S.Ct. 2100 and *Pedro*, 825 F.2d at 1399).[8]

(c) As a matter of clearly established Supreme Court law, the Board's or Governor's decision to deny parole must be supported by "some evidence" with some indicia of reliability and cannot otherwise be arbitrary.[9] *See Irons*, 505 F.3d at 851; *Sass*, 461 F.3d at 1129 (quoting *Superintendent v. Hill*, 472 U.S. 445, 457, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)); *Jancsek*, 833 F.2d at 1390 (adopting the *Hill* standard); *see also Biggs*, 334 F.3d at 915; *McQuillion*, 306 F.3d at 904.[10]

(d) In denying parole, the Board or Governor may rely solely on unchanging factors such as the circumstances or gravity of the commitment offense, and the prisoner's conduct prior to imprisonment. *See Irons*, 505 F.3d at 851–53; *Sass*, 461 F.3d at 1129; *Biggs*, 334 F.3d

at 916; *Jancsek*, 833 F.2d at 1390–91. The Ninth Circuit has observed that reliance on such unchanging factors to deny parole *might* eventually constitute a violation of due process. *See Biggs*, 334 F.3d at 916–17; *see also Irons*, 505 F.3d at 853; *Sass*, 461 F.3d at 1129. However, that observation by the Ninth Circuit in *Biggs* constituted merely *dicta*. *See Kunkler v. Muntz*, 226 Fed. Appx. 669, 670–71 (9th Cir.2007) (referring to the Ninth Circuit's comments in *Biggs* about the continued reliance on the gravity of the commitment offense as dictum) (now citable for its persuasive value pursuant to Ninth Circuit Rule 36–3).

(e) By way of contrast to the Ninth Circuit's explicit holding that the "some evidence" standard is clearly established under Supreme Court law for AEDPA purposes, the Ninth Circuit has never *held* that, as a matter of clearly established Supreme Court law, due process is violated by the Board's or the Governor's continued reliance on the unchanging circumstances of the commitment offense to deny parole. *See Medway v. Schwarzenegger*, 257 Fed.Appx. 44, 45 (9th Cir.2007) ("there is no clearly established Federal law ... that limits the number of times a parole board or the governor may deny parole based on the brutality of the commitment offense") (now citable for its persuasive value pursuant to Ninth Circuit Rule 36–3); *Culverson v. Davison*, 237 Fed.Appx. 174, 177 (9th Cir.2007) (same) (now citable

---

**8.** Petitioner does not allege in any of his claims herein that he was denied the procedural protections guaranteed by the Due Process Clause.

**9.** The Court discusses the "some evidence" standard in greater detail in the next section.

**10.** Again, although the Ninth Circuit has by now repeatedly held that the "some evidence"

standard is clearly established for AEDPA purposes, respondent would have this Court disregard these Ninth Circuit holdings on the basis that no Supreme Court authority requires application of the some evidence standard to a parole decision (*See* Ans. at 4, 7). Again, since respondent is unable to point to any contrary intervening Supreme Court decision, this Court is bound by the Ninth Circuit authority.

for its persuasive value pursuant to Ninth Circuit Rule 36–3).

**B. The "some evidence" standard after In re Lawrence**

Under *Irons*, the Court's analysis of whether the Board's or the Governor's unsuitability determination is supported by some evidence is framed by the "statutes and regulations governing parole suitability" determinations in California. *See Irons*, 505 F.3d at 851. First, the Court must determine the findings "necessary to deem a prisoner unsuitable for parole." Then, the Court must review the record to determine whether the state court's decision holding that these findings were supported by "some evidence" constituted an unreasonable application of the "some evidence" standard. *See id.* at 851. However, "[t]o determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.'" *See Sass*, 461 F.3d at 1128.

California law mandates that a parole release date be set *unless* the panel determines that "the gravity of the current or convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offenses, is such that consideration of public safety requires a more lengthy period of incarceration...." *See* Cal.Penal Code § 3041(b). The Board panel is charged with determining "whether the life prisoner is suitable for release on parole," and whether "the prisoner will pose an unreasonable risk of danger to

society if released from prison." *See* Cal. Code Regs. tit. 15, § 2402(a). In determining suitability for parole, the panel is directed to consider "all relevant, reliable information," and is guided by circumstances tending to show suitability and unsuitability for parole.[11] *See id.* at § 2402(b)-(d). In *In re Lawrence*, 44 Cal.4th 1181, 82 Cal.Rptr.3d 169, 190 P.3d 535 (2008), the California Supreme Court recently provided the following clarification:

"A parole release decision authorizes the Board (and the Governor) to identify and weigh only the factors relevant to predicting 'whether the inmate will be able to live in society without committing additional antisocial acts.' These factors are designed to guide an assessment of the inmate's threat to society, *if released*, and hence could not logically relate to anything but the threat *currently* posed by the inmate." (internal citations omitted). [ ... ]

"Under the statute and governing regulations, the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public. It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." *Id.* at 1205–06, 1212, 82 Cal.Rptr.3d 169, 190 P.3d 535.

---

11. "All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behav-ior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release...." Cal.Code Regs. tit. 15, § 2402(b).

Accordingly, the California Supreme Court held in *Lawrence*, "because the core statutory determination entrusted to the Board and the Governor is whether the inmate poses a current threat to public safety, the standard of review properly is characterized as whether 'some evidence' supports the conclusion that the inmate is unsuitable for parole because he or she currently is dangerous." *Id.* at 1191, 82 Cal.Rptr.3d 169, 190 P.3d 535; *see also In re Shaputis,* 44 Cal.4th 1241, 1254, 82 Cal.Rptr.3d 213, 190 P.3d 573 (companion case to *Lawrence*). With respect to the Board's or Governor's reliance solely on the commitment offense to deny parole, the California Supreme Court also held in *Lawrence:*

> "[T]he aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety."
>
> *Lawrence,* 44 Cal.4th at 1214, 82 Cal. Rptr.3d 169, 190 P.3d 535.

Thus, the California Supreme Court has expressly rejected the notion that the mere existence of one or more unsuitability factors described in the State's regulations is itself necessarily sufficient to support the ultimate conclusion that the inmate currently poses an unreasonable risk of danger if released, which is the "focus" of and only relevant determination underpinning the parole decision. *See Lawrence,* 44 Cal.4th at 1210, 82 Cal. Rptr.3d 169, 190 P.3d 535. As a matter of California law, the individualized consideration of the specified factors that is due an inmate "requires more than rote recitation of the relevant factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision—the determination of current dangerousness." *See id.*

■ This Court is bound by the California Supreme Court's construction of its own laws. *See McGuire,* 502 U.S. at 67–68, 112 S.Ct. 475; *see also Bradshaw v. Richey,* 546 U.S. 74, 76, 126 S.Ct. 602, 604, 163 L.Ed.2d 407 (2005). Moreover, as noted above, the *Irons* decision itself explicitly instructs that the California statutes and regulations frame the application of the some evidence standard. Given the *Irons* instruction and the California Supreme Court's recent clarification that the mere existence of any one of the factors identified in the State's regulations does not necessarily support the conclusion that an inmate poses a current risk of dangerousness if released, this Court joins those other California District Courts that have found that, in order for the some evidence standard to be satisfied, the factors identified by the BPT or Governor in denying parole must themselves support the ultimate conclusion that the inmate's release currently poses an unreasonable risk of danger to the public.[12] *See, e.g., Adams v. Schwartz,* 2008 WL 4224561, at *12–*13 (E.D.Cal. Sept. 12, 2008) (granting habeas relief, citing *In re Lawrence* and describ-

---

12. Although application of the some evidence standard in this manner is precisely how the Ninth Circuit framed the standard in the now uncitable *Hayward* decision, this Court does not rely on *Hayward* in concluding that some evidence must support the *decision* of the Board or Governor and not simply the enumerated factors. Rather, the Court relies on the *Irons* court's instruction to frame application of the some evidence standard by reference to the State's statutes and regulations coupled with the California Supreme Court's recent clarification of the proper construction of those statutes and regulations.

ing some evidence standard as requiring that "an inmate poses a current threat to public safety, rather than some evidence of the existence of a statutory unsuitability factor"), Report and Recommendation adopted at 2008 WL 4601088 (Oct. 14, 2008); *Tash v. Curry*, 2008 WL 3984597, at *4, *10–*12 (N.D.Cal. Aug. 27, 2008) (granting habeas relief, citing *Irons's* direction to look to California law and analogizing case to *In re Lawrence* ); *see also Ortega v. Dexter*, 2008 WL 5263833, at *6 (C.D.Cal. Dec. 16, 2008) (denying habeas relief, but citing *In re Lawrence* and describing some evidence standard as "not whether the evidence supported any particular factor regarding parole suitability, but rather whether 'some evidence' indicates the prisoner's release unreasonably would endanger public safety").

## C. Analysis

### 1. Petitioner's prior criminal record

 The Superior Court implicitly found that petitioner's prior criminal record, relied upon by the Board panel in support of its unsuitability determination, was supported by some evidence. (*See* Pet., Exh. E at 3).[13] As reflected above, the panel found that there was "criminal conduct and violence" in petitioner's past, that the murder did not prevent him from committing two additional armed robberies, and that he failed to profit from society's previous attempts to correct his criminalities, specifically juvenile probation. (*See* Transcript at 61). Petitioner's prior criminal record, however, was barely existent, and contrary to the panel's finding, did not involve violence. Petitioner had been arrested and released as a juvenile for malicious mischief and grand theft auto, but he had only one juvenile convic-

tion for a robbery not involving the use of a weapon. Petitioner's only adult convictions resulted in his current incarceration. The panel did not explain how this minimal prior criminal record or petitioner's failure to profit from juvenile probation to which he was sentenced as a 16–year–old, was probative of petitioner's risk of danger nearly 30 years later. Likewise, the panel did not explain how the fact that petitioner was not dissuaded by the murder from committing additional armed robberies was probative of petitioner's current dangerousness. Petitioner repeatedly has stated that he was unaware that he even had hit Mr. Rodriguez when he fired the rifle. More importantly, the fact that petitioner committed two additional armed robberies as an 18–year–old cannot be said to be probative of his current dangerousness 30 years later, given the uncontroverted evidence of petitioner's rehabilitation in prison, described in detail below.

### 2. Petitioner's prison disciplinary record

The Superior Court found that notwithstanding petitioner's "solid record of good institutional behavior" since 1989, some evidence supported the Board panel's finding that petitioner's disciplinary record affected his risk of future criminality. (*See* Pet., Exh. E at 2). In relying on petitioner's prison disciplinary record in denying parole, the panel acknowledged that petitioner had not sustained a serious violation in almost two decades and that his last minor incident was nearly a decade prior, but then expressed its "hope" that the gains would become "long-term in nature." (*See* Transcript at 62).

Petitioner's early prison disciplinary record reflects his drug addiction and lack of

---

**13.** Under *Ylst v. Nunnemaker*, 501 U.S. 797, 803–04, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991), it may be presumed that the California Supreme Court, by its silent denial of petition-

er's habeas petition raising the same claim, did not intend to change the Superior Court's reasoned decision rejecting it.

regard for the institutional rules; however, it reflects almost no violence. Specifically, only one 115 disciplinary report involved the use of violence, while one other involved the attempted use of force. The remainder of the 115 disciplinary reports reflect violations that were non-violent in nature, such as being out of bounds, refusing to leave the yard by participating in a sit-down demonstration, retaining a kitchen spoon, and falsifying meal tickets. Several others involved the possession of drugs or drug paraphernalia. (*See* Pet., Exh. D at 6). The Board panel failed to articulate any nexus between petitioner's almost entirely non-violent prison disciplinary record—which has been clear of serious violations for nearly 20 years and non-serious incidents for nearly 10 years—and his present risk of danger to the public if released.[14]

That petitioner's prison disciplinary record does not support a finding of current dangerousness is borne out by petitioner's psychological evaluations. Specifically, with respect to the disciplinary violations, petitioner's most recent evaluating psy-

chologist described those violations as "devious, somewhat psychopathic plans to avoid adhering to institutional rules and regulations—but nonviolent as well." She opined that the fact that his most recent (115) violation was in 1989 suggested he had "developed self-control over the years of his incarceration," and found that, "at the present time, he clearly presents as a negligible risk for violence in prison." (*See id.*). She further noted that, while petitioner had engaged in anti-social activities for at least a dozen years after he was received into the prison, "these are [ ] historical issues; at the present time, he seems to have turned his life around. Given his ability to exhibit prosocial attitudes and behaviors for over a decade, it must be assumed that the positive changes have become part of his basic personality structure." (*See* Pet., Exh. D at 20).

More generally, with respect to petitioner's rehabilitation in prison, while petitioner's psychological evaluations initially were unfavorable of release, they became favorable over time as petitioner exhibited positive institutional behavior and gains.[15] In

---

**14.** It appears that the Superior Court attempted to supply this missing nexus in its decision:

> "[W]hile a solid record of good institutional behavior may render past misbehavior irrelevant to suitability after a certain period of time, the court finds that there is some evidence that this period of time has not yet lapsed because the majority of petitioner's violations involve alcohol and drugs, a factor affecting petitioner's future risk of criminality." (*See* Pet., Exh. E at 2).

The Court notes, however, that the Board panel did not reason that petitioner posed a current risk of danger due to his drug-use related disciplinary violations and that, under California law, "it is inappropriate for courts to salvage the Board's inadequate findings by inferring factors that might have been relied upon. *At minimum,* the Board is responsible for articulating the grounds for its findings and for citing to evidence supporting those grounds." *In re Roderick,* 154 Cal.App.4th

242, 265, 65 Cal.Rptr.3d 16 (2007); *see also In re Burdan,* 169 Cal.App.4th 18, 28, 86 Cal.Rptr.3d 549 (2008) (post-*Lawrence* decision quoting *Roderick,* 154 Cal.App.4th at 265, 65 Cal.Rptr.3d 16 and *In re DeLuna,* 126 Cal.App.4th 585, 593, 24 Cal.Rptr.3d 643 (2005)); (Italics in original); *In re DeLuna,* 126 Cal.App.4th 585, 593, 24 Cal.Rptr.3d 643 (2005) ("We must confine our review to the stated factors found by the Board, and all the evidence presented at the parole hearing which is relevant to those findings, not to findings that ... the Board might have made.").

**15.** The Court notes that only the most recent evaluations are probative of petitioner's current danger. *See In re Aguilar,* 168 Cal. App.4th 1479, 1490, 86 Cal.Rptr.3d 498 (2008) ("Where, as here, a stale negative psychological evaluation is superseded by subsequent positive evaluations, the previous negative evaluation does not constitute evidence

a 1976 reception evaluation, the doctor opined that petitioner retained a "high propensity towards aggressive and assaultive behavior." (*See* Pet., Exh. D at 9). In a 1978 evaluation, petitioner was considered to pose an "average" potential for violence if released. (*See* Pet., Exh. D at 10). In his 1982 evaluation, the doctor opined that petitioner exhibited a certain amount of immaturity, suggestibility, and egocentricity but that he also demonstrated strong feelings of guilt and was "quite aware of his previous delinquent, selfish, self-serving, and 'spoiled brat' tendencies." The doctor found that petitioner's MMPI profile was "prognostically hopeful" as his profile was not common among the great majority of sociopathic, antisocial prison inmates. (*See* Pet., Exh. D at 9). Petitioner's violence potential was still considered "average" in his 1984 and 1987 evaluations. (*See* Pet., Exh. D at 11–12). In 1991, the evaluating doctor opined that petitioner had "matured while in prison" and that his potential for violence was below average for the inmate population. The same doctor found petitioner's violence potential "well" below average in 1992, and observed in 1994 that petitioner's impulse control was "excellent" as evidenced by his lack of serious disciplinaries in five years. (*See* Pet., Exh. D at 12). As of 1995, the evaluating doctor opined that petitioner was "psychologically rehabilitated" and "prepared to return to the community." (*See* Pet., Exh. D at 13). Another doctor prepared a report in 1996 in conjunction with petitioner's "Category X" programming, observing therein:

> "Seventeen prior BPT evaluations were present in [petitioner's] Central File. Generally, they suggested gradually increasing maturity and self control and

that the inmate poses a current danger to the public.") (citing *Lawrence*, 44 Cal.4th at 1223–24, 82 Cal.Rptr.3d 169, 190 P.3d 535).

gradually decreasing evidence of characterological flaws over the years of his incarceration. In addition, any potential for violence has reportedly diminished to negligible over the years." (*See* Pet., Exh. D at 10).

In a separate 1996 evaluation, a different doctor opined that petitioner's psychological/psychiatric condition was so stable that future mental health evaluations would likely be irrelevant in predicting future violence potential. (*See* Pet., Exh. D at 13). The evaluations did continue, however. In 1999, the evaluating doctor opined that petitioner's violence potential, considered to be average in the past, had greatly decreased and that it appeared that petitioner had the "internal resources and maturity necessary as well as the motivation to make something of his life" such that the doctor could foresee "no significant risk factors or precursors to violence." (*See* Pet., Exh. D at 13). In a 2003 evaluation, the doctor opined that petitioner's current risk of dangerousness was low. (*See* Pet., Exh. D at 14). As noted, the 2004 evaluation also was favorable of release. The doctor opined therein that petitioner "presented at *low* risk for violence." (*See* Pet., Exh. D at 15).

On this record, the Court is compelled to find that petitioner's prison disciplinary record does not provide some evidence of petitioner's current dangerousness.

### 3. *The circumstances relating to the commitment offense*

With respect to circumstances relating to the commitment offense, the Court concurs with the Superior Court that the Board panel's finding that the motive for the crime was inexplicable is contradicted by the record since petitioner explained that his motive was to impress his friends.[16] The Court also concurs with the

16. As for the Superior Court's finding that petitioner's motive for the crime was trivial (*see* Pet., Exh. E at 2), the Court cannot rely on a finding that the Board panel did not

Superior Court that there is some evidence in the record to support the panel's finding that there were multiple victims since petitioner did fire his gun at more than one bar patron, though only one was struck. That the evidence supports the finding that the crime was carried out in a dispassionate manner, however, is less clear. Petitioner fired his rifle at Rodriguez as he attempted to flee out the back door. According to petitioner, however, he intended only to gain Rodriguez's compliance by firing at him, did not intend to hit him, fired only once, and did not know that he had hit him. In any event, even assuming this finding is supported by some evidence, the fact remains that the Board panel failed to articulate any nexus between the findings that there were multiple victims and that the crime was carried out in a dispassionate manner, and petitioner's current dangerousness. In the face of overwhelming evidence of petitioner's rehabilitation in prison and suitability for parole, exhibited by his lack of serious disciplinary violations in nearly 20 years and his lack of minor incidents in nearly 10 years, his participation in AA/NA and other self-help groups, his educational advancement, his volunteer work and prison employment, his approved parole plans, and his positive psychological evaluations, the Court finds that the circumstances of the commitment offense do not constitute "some evidence" bearing "indicia of reliability" to support an unsuitability finding. *See Tash v. Curry*, 2008 WL 3984597, at *12 (finding Governor's parole reversal based on circumstances of commitment offense unsupported by some evidence and arbitrary in light of "the extensive evidence of Petitioner's in-prison rehabilitation and exemplary behavior" after 22 years of incarceration on a 17–year-to-life sentence); *see also Adams v. Schwartz*, 2008 WL 4224561, at *11 (finding that "petitioner's age, health, religious beliefs, stable family history and present relationships, lack of prison disciplinaries since 1997, commitment to sobriety, and psychologists' reports demonstrate he no longer poses an unreasonable risk to public safety" and that parole rescission based on circumstances of commitment offense and criminal record was not supported by some evidence where petitioner had served 14 years past minimum eligible parole date).

### 4. *Conclusion*

Because there was no reliable evidence before the Board panel supporting its conclusion that petitioner's release posed an unreasonable risk to public safety, the Court finds and concludes (a) that the Board's decision resulted in an arbitrary deprivation of petitioner's liberty interest in parole and violated due process, and (b) that the State courts' determination to the contrary was based on an unreasonable determination of the facts in light of the evidence presented and involved an unreasonable application of the "some evidence" standard.[17]

### RECOMMENDATION

IT THEREFORE IS RECOMMENDED that the District Court issue an

---

make, as the authorities cited in footnote 14 make clear.

**17.** Citing *Biggs*, petitioner also claims that the continued denial of parole based on outdated immutable facts violates due process by amending his prison term to life without any possibility of parole. (*See* Pet. Mem. at 17–21; Trav. at 11–12). The Court is *not* recommending that relief be granted on the basis of a claim raised under *Biggs*. As noted above, the Court construes the language in *Biggs* cautioning against continued reliance on immutable factors as constituting merely dicta, as opposed to clearly established Supreme Court law. *See Kunkler v. Muntz*, 226 Fed. Appx. 669, 670–71.

Order: (1) approving and adopting this Report and Recommendation; and (2) directing that Judgment be entered granting a writ of habeas corpus as follows: The Board shall find petitioner suitable for parole at a hearing to be held within 30 days of the finality of this decision, unless new evidence of his conduct in prison or change in mental status subsequent to the June 29, 2006 parole consideration hearing is introduced that is sufficient to support a finding that petitioner currently poses an unreasonable risk of danger to society if released on parole; and in the absence of any such new evidence showing petitioner's unsuitability for parole, the Board shall calculate a prison term and release date for petitioner in accordance with California law. Further, if the release date already has lapsed, respondent shall, within 10 days of the Board's hearing, either release petitioner forthwith if his release date lapsed more than three years earlier, or release petitioner on parole for that period of his three year parole term that remains if the release date lapsed less than three years earlier.

DATED: January 26, 2009